COMPUTER SYSTEMS OF AMERICA, INC. *vs.* WESTERN RESERVE
LIFE ASSURANCE COMPANY OF OHIO.

Suffolk.   January 8, 1985. — March 4, 1985.

Present: GREANEY, C.J., KAPLAN, & WARNER, JJ.

*Contract,* Equipment lease, Construction of contract, Performance and
    breach, Damages.

Under a computer equipment lease providing that if the "Equipment or any
    Item of Equipment . . . shall be obsolete or surplus to lessee's require-
    ments, in lessee's sole judgment, then lessee may . . . terminate this
    lease with respect to such Equipment or Item," the lessee did not have
    the right to terminate the lease with respect to the input-output unit of
    the leased system when the central processing unit became obsolete and
    was replaced by a new unit, where the input-output unit was compatible
    with the new central processing unit and was, in fact, used by the lessee
    with the new unit for several months. [433-438]

Where under the terms of a computer equipment lease the lessee was entitled
    to terminate the lease with respect to the central processing unit only,
    rather than with respect to the entire system, the lessor's solicitation of
    bids for the purchase or lease of the central processing unit, rather than
    the entire system, did not violate the termination provisions of the lease.
    [438-439]

CIVIL ACTION commenced in the Superior Court on
November 1, 1976.

The case was heard by *Elizabeth J. Dolan,* J.

*Erik Lund* for the plaintiff.

*Richard W. Renehan (Stephen M. Nolan* with him) for the
defendant.

GREANEY, C.J.   This is an action by Computer Systems of
America, Inc. (CSA), against Western Reserve Life Assurance
Company of Ohio (Western Reserve) for breach of a lease of
computer equipment. A judge of the Superior Court, after trial
without a jury, concluded that Western Reserve had properly
terminated the lease and, further, that because CSA had not

complied with certain provisions of the lease it was not entitled to be paid a termination charge as called for by the lease. CSA has appealed.[1] We reverse.

The following facts are taken from the judge's findings with some supplementation from the record. On September 13, 1973, Western Reserve executed an agreement with CSA for the lease of an IBM 360/30 F computer system for Western Reserve's business. The lease consists of eighteen pages, three appended schedules, and an exhibit, and was drawn by CSA in accordance with its standard form for the lease of computer equipment. In section 1 and schedule 1 of the lease, the system is described. It consists of six items or parts of hardware: the 2030 processing unit, 1051 control unit, and 1052 printer keyboard (and related equipment) which together form the CPU (central processing unit); and the 2821 control unit, 2540 card read punch, and 1403 printer (and related equipment) which together form the I/O (input/output unit).[2] (Schedule 1, containing a description of each piece of leased hardware, is attached to this opinion as Appendix A). In sections 2 and 3, the term of the lease is established at sixty months from October 15, 1973, the date of the first rental payment. Western Reserve was obligated to pay rent in sixty installments based on a factor of .011748 of the invoice cost of each item set forth in schedule 1, with payments due on the fifteenth of each month.

---

[1] CSA does not contest the decision by the judge adverse to it on its other claims, which included claims that Western Reserve owed lease payments and storage charges on the leased equipment input/output unit and had violated G. L. c. 93A, §§ 2(*a*) and 11.

[2] Some assistance with terminology may be helpful at this point. According to Computer Law: Evidence and Procedure § 2.02, at 2-7 (1983), a "digital computer is conveniently thought of functionally as composed of five elements: Input, Storage (sometimes called Memory), Control, Logic (sometimes called Arithmetic), and Output. Control and Logic are sometimes referred to jointly as the central processing unit ('CPU').

"The function of Input is to get instructions and data, prepared in some computer-readable form, into the computer. Storage retains the data and instructions so entered, as well as the intermediate and final results of processing. Control directs the whole process, in accordance with predetermined instructions kept in Storage. Logic performs the arithmetic and logical operations. Output disgorges the requisite information in accordance with instructions."

The critical provision of the lease, insofar as this controversy is concerned, is the first paragraph of section 12.2, captioned "Termination with Respect to Items of Equipment." This provision allows Western Reserve to terminate the lease with respect to the "Equipment or any Item of Equipment having a model number, serial number and Invoice cost as set forth on Schedule 1" (see Appendix A), when Western Reserve determines that the equipment or any item of equipment is "obsolete or surplus to [its] requirements." The provision leaves this determination to Western Reserve's "sole judgment," but requires ninety days' prior notice of termination.[3]

Approximately one year after execution of the lease, Western Reserve decided that an increase in its volume of business necessitated upgrading the CPU. It entered into negotiations with CSA for replacement of the CPU with a larger CPU. These negotiations continued until the fall of 1975, when Western Reserve concluded that agreement could not be reached on the terms of a new lease and decided to purchase its own larger CPU. On October 21, 1975, Western Reserve notified CSA by letter of its intention to terminate the entire lease within ninety days, reasoning that section 12.2 gave it the right to terminate completely when the CPU became obsolete. The letter also sought further discussions concerning an offer Western Reserve had made to purchase a larger CPU. Despite the request for discussions, Western Reserve, one week later, purchased a larger CPU from another company.

Subsequently, the parties engaged in further negotiations about disposition of the old system. On November 7, 1975, Western Reserve offered to buy the entire old system from CSA

---

[3] The full text of the contested paragraph of section 12.2 reads as follows: "If the Equipment or any Item of Equipment having a model number, serial number and Invoice Cost as set forth in Schedule 1 hereto describing such Item shall be obsolete or surplus to lessee's requirements, in lessee's sole judgment, then lessee may, at its option, upon not less than 90 days' prior notice to lessor, terminate this lease with respect to such Equipment or Item on the date of payment of the twenty-fifth (25th) Periodic Rent installment or on any Periodic Rent installment payment date thereafter ('Effective Date of Termination') provided that no Event of Default shall have occurred and be continuing."

for its "termination value" (see part 2 of this opinion, *infra*). On December 3, 1975, it renewed this offer and reaffirmed its intention to terminate the entire lease. On December 4, 1975, CSA responded by stating that it would agree to termination of the lease with respect to the CPU, but not the I/O,[4] which it believed was neither obsolete nor surplus. This position was consistent with CSA's construction of the termination provision during the parties' prior discussions (namely, that termination could be effected only as to individual items of equipment which had become obsolete or surplus). CSA also offered to sell Western Reserve the old CPU component and to continue leasing it the I/O component.

In January, 1976, the parties agreed to extend the termination date of the lease to February 15, 1976. On January 28, Western Reserve withdrew its offer to purchase the entire old system. By that date it had purchased a new I/O from another company to replace the old I/O which it had been using until then with its new CPU. On February 15, Western Reserve considered the lease terminated and stopped paying rent on the entire system. On February 19, 1976, Western Reserve requested instructions from CSA as to disposition of the I/O and reiterated its position as to the meaning of the termination provision of the lease. For its part, CSA continued billing monthly rental fees on the I/O through April, 1976. At that time, it removed the I/O, reserving its rights under the lease. This lawsuit followed.

1. *Termination of the lease.* Surprisingly, both parties agree that the lease is unambiguous — an agreement which renders construction of the lease, on the facts, a matter of law, for this court.[5] See *Monadnock Display Fireworks, Inc.* v. *An-*

---

[4] It should be noted here that the original system used the CPU for the IBM 360/30 system. The new CPU was the one used in an IBM 360/40 system. The I/O could be used with either CPU and was in fact used by Western Reserve with the new CPU until sometime in early 1976.

[5] We say "[s]urprisingly" because, although the parties agreed that the language of section 12.2 is not ambiguous, and the judge accordingly ruled that parol evidence of the parties' intent, and circumstances pertaining to the execution of the lease, was inadmissible, we think, for several reasons,

434                                19 Mass. App. Ct. 430

Computer Systems of America, Inc. *v.* Western Reserve Life Assurance Co. of Ohio.

*dover,* 388 Mass. 153, 157 (1983); *Edwin R. Sage Co.* v. *Foley,* 12 Mass. App. Ct. 20, 27 (1981). Moreover, the parties' agreement that the lease is free from ambiguity requires that the critical words and phrases of the lease be construed in accordance with their ordinary and usual sense, see *Ober* v. *National Cas. Co.,* 318 Mass. 27, 30 (1945); *Fried* v. *Fried,* 5 Mass. App. Ct. 660, 663 (1977), giving reasonable meaning to each of the provisions of the lease.[6] See *McMahon* v. *Monarch Life Ins. Co.,* 345 Mass. 261, 264 (1962); *St. Germain & Son* v. *Taunton Redevelopment Authy.,* 4 Mass. App. Ct. 46, 49 (1976).

The language in dispute here is "obsolete or surplus to lessee's requirements," "in lessee's sole judgment," and "equipment or any item of equipment." CSA maintains that this lan-

---

that such evidence would have been helpful and should have been admitted. First, there is some indication that section 12.2 is not standard in leases of this kind and that it was added only after extensive negotiations between the parties. More important, there is a fundamental and legitimate disagreement between the parties over the exact meaning of the language in section 12.2, and its construction in the context of the entire lease. On its face, section 12.2 is not clear. If such a disagreement does not constitute ambiguity, we have difficulty understanding what would. The judge's conclusion of law that the lease was not ambiguous, and yet that "the issue . . . is . . . interpretation of the language of certain provisions," is, in the context of this case, somewhat contradictory. She was under no obligation to accept the parties' legal view of the lease, particularly since they appear to have agreed that the lease was not ambiguous only because each felt that it had a different clear meaning. In any case, ambiguity on the face of a contract need not be present in order to admit "evidence of circumstances," as long as the evidence is not offered to contradict written terms. *Robert Indus., Inc.* v. *Spence,* 362 Mass. 751, 754 (1973). See also 3 Corbin, Contracts §§ 572 A and B (1960 & Supp. 1971); Restatement (Second) of Contracts § 214 (1981). However, because no parol evidence was introduced at trial, and neither party has questioned the judge's ruling, we accept the case as presented, and decide it on the premise that the contract's terms are not ambiguous.

[6] For the reasons stated above, we also think that evidence of trade custom or usage would have been helpful and should have been admitted. But again there is none in the record, and the judge's ruling that such evidence was inadmissible, rejecting CSA's effort to offer evidence of trade and custom, has gone unchallenged. Accordingly, we fall back on the standard canon of construction that unambiguous words are to be given their usual and ordinary meanings.

guage permits Western Reserve to terminate the lease only as to items of hardware which, using its reasonable judgment, it determines are individually no longer functionally usable or needed for its business. CSA argues that the lease can be terminated with respect to the system as a whole only when both of its major components, the CPU and the I/O, are no longer functionally usable or needed. Western Reserve, on the other hand, contends that it has the right to terminate the lease with respect to the entire system when, using its reasonable judgment, it determines that the heart of the system, the CPU, can no longer functionally satisfy its needs. Western Reserve urges that sound business practice, as well as functional use, constitute valid bases for deciding that all of the equipment was no longer needed.

We agree with CSA's construction of the lease. Lexicographers define the word "obsolete" as "no longer active or in use"[7] or as "[n]o longer used or useful, because of outmoded design or construction."[8] With respect to the computer equipment involved in this case, the word "obsolete" refers, in our view, to Western Reserve's technical or functional requirements. If the equipment, or some part of it, became technologically outmoded or no longer capable of handling Western Reserve's day-to-day business needs, the lease could be terminated as to the equipment or that item. "Surplus" has the different connotation of "excess" or whatever "remains when use or need is satisfied."[9] In our view, surplus pertains to West-

[7] Webster's Third New Intl. Dictionary 1558 (1971).

[8] The American Heritage Dictionary 907 (1976).

[9] Webster's Third New Intl. Dictionary, *supra* at 2301. The American Heritage Dictionary, *supra,* has (at 1295) a similar definition of the word "surplus." We have examined technical dictionaries and sources and have found no special definition of the terms "obsolete" or "surplus" in any of them. This satisfies us that the dictionary definitions quoted, in the absence of parol evidence or evidence of trade or custom, see notes 3 and 4, *supra,* are the best we can obtain in the circumstances. The technical dictionaries and sources which contain no definitions of the words are the following: IBM Vocabulary for Data Processing, Telecommunications & Office Systems (7th ed. 1981); Operating Systems Elements: A User Perspective (1982); The Computer Dictionary (1983); Webster's New World Dictionary

ern Reserve's over-all business purposes and operations. If Western Reserve decided, for example, that its operations had changed to the point where the equipment was no longer required or capable of carrying them out effectively, it would have the right to terminate the lease under the surplus prong of section 12.2. Although there may be some overlap in the two terms, they are not redundant.

Everyone agrees that the CPU had become obsolete and that Western Reserve could properly terminate the lease as to that component. The I/O, on the other hand, was completely compatible with the new CPU and in fact was used with it by Western Reserve for several months while the parties discussed settlement of their dispute over termination. The I/O was, therefore, not obsolete. Nor was it surplus. There is no question that the I/O could have been used thereafter with the new CPU, and the judge made no finding (and none would have been warranted by the evidence) that the I/O was inadequate to Western Reserve's needs. She found it to be surplus only by stretching the term surplus to cover nonfunctional situations. This construction, however, gives the word surplus the meaning of "not wanted," rather than "not needed or used," and would allow Western Reserve to reject the I/O simply on the basis of cost or convenience.[10] Such a construction would, in effect, completely nullify any limitation on Western Reserve's right to terminate and would transform section 12.2 from a clause which contemplates termination only in specific circumstances into a broad termination at-will provision. Whenever Western Reserve concluded, for whatever reason, that any major component of the system was undesirable, it could simply claim that the component had become surplus to its needs (viz. not

of Computer Terms (1983); Random House Dictionary of New Information Technology (1983); The McGraw-Hill Computer Handbook (1983); and Introduction to Computers: Developing Computer Literacy (1983).

[10] These were in fact the motives behind Western Reserve's decision to reject the I/O. By so doing, it would save approximately $40,000 in termination charges because the market value of the CPU depreciates much less rapidly than the value of the I/O. Such considerations however, cannot carry the day for Western Reserve.

wanted) and reject the entire lease. We think that, if the parties had intended at-will termination, they could have said so, either expressly or by omitting the language limiting the right to terminate.

We also believe that the text section 12.2, and other parts of the lease, support our construction because acceptance of Western Reserve's construction would render meaningless the careful distinctions in the lease between "equipment" and "item of equipment." These distinctions appear first, in section 1, which describes the system in terms of a detailed line-by-line itemization of equipment in schedule 1 (see Appendix A); thereafter, in the provision in dispute; and later, in the third through fifth paragraphs of section 12.2 dealing with the computation of the termination charge. The precise wording of section 12.2 is particularly revealing: "If the Equipment or any Item of Equipment having a model number, serial number and Invoice Cost as set forth in Schedule 1 hereto describing such Item [Appendix A] shall be obsolete or surplus to Lessee's requirements in Lessee's sole judgment, then Lessee may, at its option . . . terminate this Lease with respect to such Equipment or Item . . . ." The repetition of the phrase "item of equipment," combined with (1) the reference to the individual breakdown in schedule 1 of the items of hardware which make up the CPU and I/O by model and serial number and invoice cost (see Appendix A), and (2) the use of the limiting word "such," expresses an intention to allow termination of only those items of hardware which Western Reserve found individually to be obsolete or surplus, rather than termination of the system as a whole (unless the system as a whole had become obsolete or surplus). Applicable here is the canon of construction that every word and phrase of a contract should, if possible, be given meaning, and that none should be treated as surplusage if any other construction is rationally possible.[11]

---

[11] The insertion of the phrase "in Lessee's sole judgment" in section 12.2 does not call for a different result. The privilege cannot negate clear distinctions made by the language of the lease nor leave any decision to terminate entirely to Western Reserve's unfettered discretion. The "sole judgment" privilege must be exercised by Western Reserve in a reasonable and honest

*National Shawmut Bank* v. *Joy,* 315 Mass. 457, 466 (1944). See *Tupper* v. *Hancock,* 319 Mass. 105, 108 (1946). *Hagerty* v. *Myers,* 333 Mass. 387, 389 (1955).

We conclude that this construction gives meaning to all of the language used in section 12.2, and elsewhere in the lease, and comports best with common sense and the probable intention of the parties. See *Stop & Shop, Inc.* v. *Ganem,* 347 Mass. 697, 701 (1964); *Fried* v. *Fried,* 5 Mass. App. Ct. at 664. Western Reserve obtains, on the one hand, the right to acquire new hardware as its business needs dictate and as new, more versatile hardware becomes available in the rapidly developing field of computer technology. Until those conditions are met CSA obtains, on the other hand, the right to insist that a major component of the system, the I/O, which accounts for one-third of the lease value, be maintained in use so long as it remains compatible with any upgraded CPU. The careful amortization of the value of the leased equipment at a factor of .011748 of *each* item of hardware is thus preserved, and the risk of loss by reason of obsolescence, or change in the character of Western Reserve's business, is fairly allocated.

2. *Damages.* Section 12.2 of the lease also requires Western Reserve to pay a charge upon the rightful exercise of its option to terminate. The provision requires both parties to "use their respective best efforts to solicit and to obtain firm written bids for the purchase or lease of such Equipment or Item" terminated, and to "submit to the other a copy of each and every offer so received." On the effective date of termination, CSA is to sell or lease the equipment to the highest bidder and Western Reserve is to pay CSA the difference between the termination value of the equipment (as fixed by schedule 2 of the lease) and the sum received by CSA from the sale or lease of the equipment.

fashion. See *Chandler, Gardner & Williams, Inc.* v. *Reynolds,* 250 Mass. 309, 314 (1924). See also *Salem Glass Co.* v. *Joseph Rugo, Inc.,* 343 Mass. 103, 106 (1961). If the word surplus requires that the portion of the system which is still functional and completely usable be kept, it follows that the sole judgment clause has been circumscribed, and that the decision to terminate the I/O, even if made in good faith, was unreasonable because contrary to the contract.

The judge ruled that CSA had not complied with the termination requirements, and was, therefore, not entitled to recover the termination charge. She construed the requirement of solicitation of bids as a "condition precedent" to Western Reserve's payment of any charge, and she faulted CSA for soliciting bids for the CPU only, rather than for the entire system. This determination, however, was based on the judge's acceptance of Western Reserve's construction of the lease. Since we have concluded that Western Reserve could terminate the lease with respect to the CPU only, rather than with respect to the entire system, CSA's solicitation of bids for the CPU only was of necessity in complete compliance with the termination provisions.[12]

It appears that there is no other dispute over the calculation of the termination charge and thus no need to have any additional hearing on damages in the trial court. Accordingly, CSA is entitled to recover damages of $64,279.24. This figure is arrived at by subtracting $10,000 (the amount realized by CSA from the sale of the CPU to the highest bidder upon termination of the lease), from $74,279.24 (the termination value of the CPU set forth in schedule 2).

3. *Conclusion.* There was no formal judgment in the sense of a docketed separate piece of paper. The order for judgment in the judge's memorandum, however, meets the test for a judgment set forth in *Lewis* v. *Emerson,* 391 Mass. 517, 518-520 (1984), and disposes of all the claims in the case. Treating that order as the judgment for purposes of Mass.R.Civ.P. 58(a), as amended, 371 Mass. 908 (1977), we direct that so much of

---

[12] Were it necessary to deal with the judge's ruling that CSA could not collect any termination charge because it had failed to comply with a "condition precedent" to collection imposed by section 12.2, we would find the ruling erroneous. There is nothing in the text of 12.2 to show that the parties intended the requirement of bid solicitation to be a condition precedent. See *Waldo Bros.* v. *Platt Contr. Co.,* 305 Mass. 349, 354, 359 (1940); *Sullivan & Sons* v. *Kay-Locke, Inc.,* 17 Mass. App. Ct. 997, 998 (1984). See also Restatement (Second) of Contracts § 277 comment b (1981); 5 Williston, Contracts § 665 (3d ed. 1961). On its face, it is an independent covenant. There are also other reasons, which we need not pursue, which would render the construction sought by Western Reserve on the bid solicitation question unfair in the circumstances.

that judgment dealing with "Count I" of the complaint (see note 1, *supra*), is reversed. A new portion of the judgment is to be entered on that count which finds for CSA and awards damages of $64,729.24 with interest. The balance of the judgment is affirmed.

*So ordered.*

APPENDIX A.

SCHEDULE 1

This Schedule is appended to and made a part of the Lease between COMPUTER SYSTEMS OF AMERICA, INC., Lessor, and WESTERN RESERVE LIFE ASSURANCE COMPANY OF OHIO, Lessee, dated September 13, 1973.

### EQUIPMENT

| Description | Model/Feature | Serial Number | Manufacturer Original Invoice Cost |
|---|---|---|---|
| Processing Unit | 2030 F | 19734 | $173,040 |
| Decimal Arithmetic | 3237 | | 970 |
| Floating Point Arithmetic | 4427 | | 1,880 |
| 1401 Basic Compatibility | 4456 | | 8,935 |
| 1402/1403 Attachment | 4463 | | 1,880 |
| 1401 CM TP SL CH | 4468 | | 2,345 |
| Interval Timer | 4760 | | 1,880 |
| Programmed Mode Switch | 5856 | | |
| 1st Selector Channel | 6960 | | 8,040 |
| 2nd Selector Channel | 6961 | | 7,430 |
| Storage Protection | 7520 | | 5,645 |
| 1051 Attachment | 7915 | | 3,885 |
| | | | |
| Control Unit | 1051 N1 | 56150 | 2,960 |
| CPU Attachment | 3130 | | 500 |
| 1st Punch Attachment | 4410 | | 275 |
| 1st Reader Attachment | 4411 | | 550 |
| | | | |
| Printer Keyboard | 1052 8 | 63465 | 2,645 |
| | | | |
| Control Unit | 2821 1 | 11591 | 37,180 |
| 1100 LPM Printer Adapter | 3615 | | 2,400 |
| Punch Feed Read Control | 5895 | | |
| Universal Char. Set Adptr. | 8637 | | 610 |
| | | | |
| Card Read Punch | 2540 1 | 11598 | 32,930 |
| Punch Feed Read | 5890 | | |
| | | | |
| Printer | 1403 N1 | 31412 | 33,970 |
| Universal Character Set | 8640 | | 380 |
| | | | $330,330 |