Bardon Trimount, Inc. *vs.* Louis E. Guyott, Jr., & others.[1]

No. 98-P-1134.

Suffolk. March 16, 2000. - August 1, 2000.

Present: Greenberg, Kaplan, & Smith, JJ.

*Environment,* Environmental cleanup costs. *Comprehensive Environmental Response Compensation and Liability Act. Contract,* Condition. *Practice, Civil,* Costs, Attorney's fees. *Words,* "Prevailing party."

Notice under the provisions of an agreement for the purchase of shares of a close corporation failed to describe "in reasonable detail" future costs to be incurred in remediating environmental damage on certain corporate property and, as a consequence, former shareholders were not liable under the agreement for such costs [772-773]; and the same result obtained with respect to insufficiently detailed notices of past costs already incurred [773]; however, with respect to future costs at a certain site, genuine issues of material fact remained regarding the diligence of the notice giver [773-776] and the adequacy of the notice [776-777].

This court concluded, consonant with the provisions of Fed.R.Civ.P. 54(d), that a defendant in a civil action filed in the Federal District Court was a "prevailing party" for purposes of a State claim for costs and counsel fees under the provisions of a contract, where the Federal action had been dismissed under Fed.R.Civ.P. 19(b), as necessary parties had not been joined and their joinder would have destroyed the jurisdictional diversity of citizenship, and the plaintiffs had not appealed. [777-780]

Civil action commenced in the Superior Court Department on March 27, 1996.

The case was heard by *Patrick J. King,* J., on motions for summary judgment.

*Peter A. Biagetti* (*Tyler E. Chapman* with him) for the plaintiff.

*Michael R. Gottfried* (*Jeffrey D. Sternklar* with him) for the defendants.

Kaplan, J. Bardon Group PLC entered into a contract, closing

---

[1]Francis R. Guyott and twenty-five other former shareholders of Guyott Company.

date May 4, 1988, with the shareholders of Guyott Company by which it purchased each and all their shares for a total base price of $100 million, and thereby acquired ownership of the Guyott Company properties. That company had been primarily in the business of supplying crushed stone, bituminous concrete, and liquid asphalt, and among its properties were eleven parcels of land, several of which were the subjects of environmental disputes stemming from alleged pollution of the sites. As the costs to be incurred in dealing with and liquidating the claims were in many respects inchoate and could not be accurately forecast, the shares purchase agreement set out rather elaborate terms for notices from Bardon Group PLC to the shareholders about the accrual of such costs and their payment divided between the two sides.

The shareholders have asserted that they are free of the duty to pay any amount now or in the future because of the alleged failure of Bardon Trimount, Inc. (Bardon), assignee of Bardon Group PLC, to furnish them with periodic notices regarding the environmental costs that complied with the terms of the agreement. The present action was by Bardon in Superior Court against the shareholders[2] for breach of contract in failing to reimburse Bardon for their agreed portion of payments already made by Bardon, and for a declaration of their continuing duty under the agreement. The shareholders entered denials of the breach and counterclaimed for a declaration in their favor. Both sides made further allegations pursuant to the consumer protection act, G. L. c. 93A.

Upon a voluminous documentary record, the parties cross-moved for summary judgment. The judge dismissed the shareholders' c. 93A claim, but entered judgment for them on all counts of Bardon's complaint, entered the declaratory judgment sought by the shareholders, and awarded them $200,677.18 in attorney's fees as the prevailing parties, pursuant to a provision of the contract. The plaintiff, Bardon, appeals. We shall in effect affirm in part and reverse in part. Neither side appeals from the denial of c. 93A relief.[3]

ENVIRONMENTAL COSTS

A. *Sites.* We begin with the sites in question. Schedule 3.19

---

[2]For convenience we refer to the defendants as the shareholders although, strictly, they ceased to be so at the closing of the stock purchase.

[3]We reserve for later statement a separate claim by Bardon against the shareholders for costs, expenses, and attorney's fees paid out in its defense of

of the agreement identifies these, indicating the status of any ongoing litigation or regulatory proceedings.

(1) *Groveland wells.* State and Federal actions were pending initiated by the town of Groveland against companies unrelated to Bardon, alleging that they had caused town drinking water wells to be polluted. Those defendants made a Guyott subsidiary[4] a third-party defendant in these actions, alleging that the source of the problem was the subsidiary's property in Haverhill, specifically a 75-acre municipal landfill the subsidiary was leasing to the city of Haverhill.

(2) *Haverhill site.* The Haverhill landfill just mentioned was, at the time of the shares purchase agreement, under a closure program begun in 1981 in settlement of a Superior Court action brought by the Massachusetts Department of Environmental Quality Engineering (DEQE) under the Oil and Hazardous Material Release Prevention and Response Act, G. L. c. 21E. In 1984, the United States Environmental Protection Agency (EPA) had placed the site on the national priorities list of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601 et seq., commonly known as the "Superfund" law. At the time of the shares purchase agreement, EPA was still in the process of identifying potentially responsible parties (PRPs)[5]; at some later date it would enter into negotiations about conducting a Remedial Investigation and Feasibility Study (RI/FS) of the site. In a financial statement annexed to the agreement, Guyott Company stated that placement on the national priorities list

a 1991 action brought by two of the shareholders against Bardon in Federal District Court.

[4]Guyott Company and its several subsidiaries became subsidiaries of Bardon after Bardon's purchase of the shares. The cost sharing provision is understood to apply as well to the subsidiaries' costs as to Bardon's.

[5]The term refers to parties considered by the EPA to be liable under CERCLA, 42 U.S.C. § 9607(a), for the costs of cleaning up a contaminated site. Typically, such parties become aware of that status through a "PRP letter" from the EPA informing them they are probably accountable for a release of hazardous substances at a site and might be required to participate in cleaning up the site or to pay EPA to do so. See *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. 689, 690-691 (1990). A PRP letter is similar to a "notice of responsibility" letter issued by the DEQE (now the Department of Environmental Protection) under G. L. c. 21E. See *Hakim* v. *Massachusetts Insurers' Insolvency Fund*, 424 Mass. 275, 277 (1997). Although no PRP letter appears in the record, it may be assumed that Guyott Company, as owner or operator of the facility, was a PRP. See 42 U.S.C. § 9607(a)(1).

was for "those sites within the United States that potentially pose the most serious threats to the environment," and "[s]ince these matters relating to the Haverhill landfill are in preliminary stages neither management nor counsel can predict their final outcome."

(3) *Ashland site.* A Guyott Company subsidiary had been named as a defendant in a Superior Court action by the town of Ashland alleging the company's property, a 97-acre quarry site, was releasing hazardous waste into adjacent town property and threatening a proposed town well with contamination. The DEQE had sent the subsidiary a notice of responsibility pursuant to G. L. c. 21E, referring to the release of waste and directing the subsidiary to conduct an investigation for purposes of remediation.

(4) *Shrewsbury site.* A Guyott Company subsidiary was on notice that its eleven acres in Shrewsbury containing its bituminous concrete plant might be contaminated and subject to G. L. c. 21E.

(5) *Other properties.* Schedule 3.19 has a catch-all provision: "From time to time prior to [the agreement] various polluting substances and wastes, including without limitation petroleum products, some one or more of which substances and waste are now classified as hazardous and/or toxic, have been released, discharged and/or disposed of on property now or formerly owned or occupied by [the Guyott Company or its subsidiaries] . . . ."

B. *Section 5.12 of Shares Purchase Agreement.* The expenses of dealing with these environmental matters were the subject of section 5.12 (see text in Appendix) by which the shareholders agreed to share the costs in excess of $1 million equally with Bardon.

The substance of section 5.12 is as follows. In general, the shareholders agreed to pay half of all "Environmental Costs" exceeding $1 million for cleaning up the sites. These costs are by definition limited to such as are "reasonably identified" and "reasonably quantified either by reference to an amount or a range of possible exposures through investigation or negotiation with third parties or the like." The language indicates that, where costs are not precisely known and have not yet been incurred, a reasonable estimate of future costs by a third party may satisfy the definition.

The shareholders' agreement to pay is "subject to" Bardon's

providing them with prescribed forms of notice within certain time limits. First, when costs of $1 million have arisen, Bardon must send "verification" of that fact along with a description of the costs in "reasonable detail, including the payees or expected payees." Similarly, Bardon must provide written "notice" of costs over the $1 million threshold, and must describe them in "reasonable detail, including the payees or expected payees." Regarding non-Haverhill sites, the shareholders are liable only for costs as to which such notice was given by Bardon within two years of the closing date. A clause similarly excuses the shareholders from Haverhill-related costs, except that the notice period is five years. Actual payment by the shareholders becomes due when Bardon submits to the shareholders "evidence" that a cost, of which timely notice was previously given, has actually "been paid or is due and payable." Unlike the case as to Bardon's giving "notice," the agreement sets no time limit for Bardon's submission of its "evidence" of payment. Considering this fact along with the inclusion of future estimates in the definition of shareable "Environmental Costs," we see that the shareholders must share even those costs incurred after a notice deadline has passed, so long as those costs were the subject of a proper future estimate and the shareholders were given proper notice of that estimate within the notice deadline.

C. *Notices under section 5.12.* (1) *Notice April, 1990.* On April 25, 1990, just shy of the two years, Bardon's subsidiary, Guyott Company, sent a letter to the shareholders stating that it had incurred and would continue to incur environmental costs in connection with the Groveland, Haverhill, Ashland, and Shrewsbury sites, as well as an additional site in Everett.[6] As to all these sites (including the Haverhill Superfund), $679,649 had been paid, and as to the non-Haverhill sites only, future costs were estimated at $7,807,400 to $10,767,400. The letter concluded by requesting that the shareholders pay one-half the amount incurred in excess of $1 million "now and in the future."

A five-page "Environmental Cost Summary" appended to the letter set out broad categories of costs for each site —

---

[6]Although there was some dispute below whether the Everett site was covered by section 5.12 of the agreement, we agree with the judge that it was included in the catch-all provision of schedule 3.19 outlined above, and thus incorporated by reference in section 5.12.

"Engineering," "Contractors," "Materials," "Administrative (overhead, management, etc.)," "Legal," and "Penalties, fines, fees, etc." Dollar figures appeared for each of these categories as costs paid and costs projected (except that projected costs were not listed for Haverhill).[7] For some of the incurred costs, totaling $537,035, the payees were named; for the balance of $142,614, neither the payees nor expected payees were named. The letter provided no detail as to what work had been done to incur the past costs, what particular work was yet to be done, how the projected costs were determined, or by whom.

(2) *Notice April, 1993.* On April 26, 1993, in the waning days of the five-year period for the notice about the Haverhill site, Bardon sent a second letter to the shareholders. It stated that environmental costs had been identified for the Haverhill landfill in an amount estimated to range from $10,300,000 to $52,638,000. Exhibit A was a letter from Balsam Environmental Consultants, Inc., an engineering firm, to Bardon. This furnished details of the estimate (except for legal costs estimated at $300,000 to $5 million[8]). The estimate described two scenarios. If the remediation were governed by Superfund hazardous waste standards, Balsam projected costs of $38,546,000 to $47,638,000. If remediation was to be under the less restrictive solid waste requirements, Balsam estimated costs of $10 million to $20 million. The notice also contained Exhibits B, C and D, showing "evidence" of paid costs to date totalling $1,875,188. 16 for all sites; thus Bardon made claim for one-half the amount over $1 million, $437,594.08. The exhibits contained supporting invoices, mostly from engineering and law firms, and documents relating to a Bardon settlement with the town of Ashland of the dispute over the site there, including a copy of a $675,000 check from Bardon to the town.

(3) *Notice April, 1995.* Bardon sent a third letter to the shareholders on April 7, 1995, stating that from January 1, 1993, through December 31, 1994, an additional $430,431.64 of costs had been incurred for all sites including Haverhill, and demanding that the shareholders pay one-half the amount. Attached were supporting invoices for legal and nonlegal work related to the sites.

---

[7]The letter stated that future cost estimates for Haverhill would be provided at a later date.

[8]The parties do not dwell on the range of the estimate of legal costs; these may be expected to depend upon and vary with the occurrence or nonoccurrence of the many contingencies in the development of the cleanup process.

D. *Present action.* As the shareholders, despite demands, were not forthcoming with any contribution to environmental costs, Bardon commenced the present action against them in Superior Court on March 27, 1996. The pleadings have already been mentioned. The nub of the case appears from the declaration prayed by Bardon, that the shareholders "are required to pay, now and in the future, one-half of all Environmental Costs in excess of $1,000,000 incurred and/or projected at all properties, including but not limited to, the excess Environmental Costs that Bardon has identified in its 1990, 1993, and 1995 Notices, and the excess Environmental Costs that Bardon may identify in the future through the submission to [the shareholders] of evidence of those Costs as they are incurred and paid."

As noted, the case presented itself to the judge upon cross-motions for summary judgment, and it is only necessary to add that the parties were in agreement that the terms of the agreement, notably section 5.12, were "unambiguous," that is, neither side thought extraneous evidence was needed to resolve any supposed ambiguities in the text; in such case the judge interprets the contract terms as a matter of law. See *Computer Sys. of America, Inc.* v. *Western Reserve Life Assur. Co.,* 19 Mass. App. Ct. 430, 433-434 & n.5 (1985); *Urban Inv. & Dev. Co.* v. *Turner Constr. Co.,* 35 Mass. App. Ct. 100, 107 n.6 (1993). See also *Fried* v. *Fried,* 5 Mass. App. Ct. 660, 662 (1977). Left open to dispute was whether the text had been complied with — thus, whether the notices given were in the detail, etc., required by section 5.12. As to such a question, either party could argue that the result was clear as a matter of law upon the record made on the cross-motions; failing such certainty, the question would have to be decided by trial as a question of fact, see Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974); *Gross* v. *Prudential Ins. Co. of America,* 48 Mass. App. Ct. 115, 118-119 (1999).[9]

E. *Judge's decision.* Regarding the non-Haverhill sites the judge concluded that the 1990 notice was inadequate: the notice, he said, contained no detail as to what work was completed or proposed and thus did not describe the costs in "reasonable detail" according to the agreement; most of the payees or expected payees were not identified, and the future cost estimates were not arrived at "through investigation or negotiations with third parties or the like," as the agreement required.

---

[9]The legal framework of the action is further sketched just following "Discussion," *infra.*

Focusing on the 1993 notice and past environmental costs at the Haverhill site, the judge held that — aside from the $675,000 paid in settlement of the Ashland suit — the invoices attached to the notice did not represent a "description" in "reasonable detail" of the work done. As to future Haverhill costs, the judge reasoned that the estimate by Balsam did not "reasonably identif[y]" or "reasonably quantif[y]" the costs because, on his view of the record, Balsam had not made an on-site investigation of the landfill itself or identified the specific remedial work to be done there. He also thought "an estimate which has a high-low range of 42 million dollars can hardly be considered 'reasonably identified and reasonably quantified.' "

Accordingly, the judge held that the plaintiff Bardon had failed to show compliance with the notice provisions sufficient to avert summary judgment in favor of the defendant shareholders, who were thereby relieved of any duty to pay for any part of past or future costs on any of the sites.

### DISCUSSION

On this appeal the parties, in agreement with the judge's apparent views, proceeded on the assumptions that the contract provisions for the notices amount to a "condition" (in older terminology, a "condition precedent"[10]) to the defendants' obligations[11]; and that the ultimate burden was upon the plaintiff to show compliance with the terms of the condition.[12] At the same time, it would be agreed that in resisting the defendants' motion for summary judgment, the plaintiff is entitled to intendments in its favor in the resolution of issues of fact, see *Ellis* v. *Safety Ins. Co.*, 41 Mass. App. Ct. 630, 642 (1996), such as the issue of "reasonableness."[13]

For purposes of this appeal, the plaintiff must be taken to

[10]As to the terminology, see Restatement (Second) of Contracts § 224 comment e (1981).

[11]Although Bardon was uncomfortable below with language of condition, it evidently accepted the pivotal point, that the shareholders' duty to pay was contingent on Bardon's providing "verification" and notice according to the agreement.

[12]In its complaint, Bardon treated this compliance as an element of its claim and seems not to balk at having to prove it.

[13]See *Previews, Inc.* v. *Everets*, 326 Mass. 333, 335-336 (1950) (whether services were performed in a "reasonably diligent, skilful, workmanlike, and adequate manner" was question of fact for jury); *Co-Ray Realty Co.* v. *Board of Zoning Adjustment of Boston*, 328 Mass. 103, 108 (1951) (what were

have forgone any possible arguments as follows: (i) The provisions regarding notice did not constitute a condition but were simply contract terms whose nonperformance should be weighed as material or not, with consequences accordingly, see *Ward* v. *American Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. 98, 100-101 (1983); *Abodeely Ins. Agency* v. *Commerce Ins. Co.*, 41 Mass. App. Ct. 274, 278-281 (1996); Restatement (Second) of Contracts §§ 237, 241 (1981); and (ii) If those provisions were a condition, then, to avoid the plaintiff's suffering disproportionate forfeiture of rights, nonperformance of the condition should be excused unless it would cause material prejudice to the defendants that was not compensable short of relieving them entirely of their cost-sharing obligation. See 2 Farnsworth, Contracts § 8.7, at 438-440 (2d. ed. 1998). Cf. *Employers' Liab. Assur. Corp.* v. *Hoechst Celanese Corp.*, 43 Mass. App. Ct. 465, 472-479 (1997).

A. *Non-Haverhill sites.* On the parties' assumptions above stated, we turn first to environmental costs at the non-Haverhill sites. For the shareholders to be liable for any non-Haverhill costs, Bardon was required, by the two-year deadline, to provide notice of environmental costs exceeding $1 million. Even if Bardon's 1990 letter provided proper notice of past costs,[14] those totaled only $679,649. Thus, all turns on the validity of the estimated future costs ($7,807,400 to $10,767,400) which exceeded the $1 million threshold. The judge found that estimate to be flawed because not made "through investigation or negotiations with third parties or the like."

---

"reasonable efforts" to provide notice); *Stabile* v. *McCarthy*, 336 Mass. 399, 404 (1957) ("reasonable efforts" to obtain planning board approval); *Kohl* v. *Silver Lake Motors, Inc.*, 369 Mass. 795, 799 (1976) ("A determination of reasonableness normally is a question of fact").

[14]We agree with the judge, however, that, with one exception, Bardon's letter failed to describe these past costs "in reasonable detail" as required by the agreement. The letter in fact gave almost no detail, other than a general categorization (e.g. "Engineering" or "Materials") of the costs and, in some cases, the name of the payee. Compare our discussion of past costs involving the Haverhill site, part B., *infra*.

The exception just referred to is the $675,000 settlement with Ashland, which was described by the notice in reasonable detail. We agree with the judge that this cost should be allowed to count toward the $1 million threshold. A careful reading of the agreement reveals that, as the judge put it, "Bardon was entitled to recover excess Environmental Costs for the Haverhill site so long as one million dollars were identified as having been spent on all 11 sites within five years of the closing date."

Bardon complains that the agreement does not say the notice must contain information about the source or basis of the estimate. The agreement does not say so expressly, but it does state the notice must describe the claimed "Environmental Costs" in "reasonable detail." It is fair to read the latter phrase as contemplating enough detail to allow the shareholders to make a judgment whether the claimed costs qualify as "Environmental Costs," the definition of which requires that future cost estimates be reasonably quantified "through investigation or negotiation with third parties or the like." Here, the notice (and the whole record on appeal, for that matter) provides no hint as to who estimated the future costs for the non-Haverhill sites, or how. The judge properly concluded that the shareholders are not liable for costs associated with the non-Haverhill sites.

B. *Haverhill Superfund site.* We agree with the judge's conclusion as to *past* Haverhill-related costs mentioned in the 1990 and 1993 letters: Bardon failed to provide "reasonable detail" of their nature. Bardon merely incorporated invoices providing the most skeletal information about what services were furnished for Haverhill and none about the purposes they were intended to serve. For example, bills dated November and December, 1991, simply stated they were for "professional services" and listed the total number of hours put in by various engineers, scientists, and draftspeople. The inclusion of some marginal detail might have raised a jury question; here the notices were virtually blank. With costs presumably already incurred, and their details known, the burden of notice-giving cast on Bardon was surely not severe. Compare *Stabile* v. *McCarthy*, 336 Mass. 399, 404-406 (1957); *Sechrest* v. *Safiol*, 383 Mass. 568, 571-572 (1981).

Regarding *future* costs — that is, those indeterminate as of the five-year notice deadline relevant to Haverhill — the case is more complex. Unlike the 1990 notice for the non-Haverhill sites, the 1993 notice for Haverhill does identify the source of the third-party estimate for future cleanup costs — it is Balsam Environmental Consultants — and discloses some details of Balsam's methodology (using its own experience, EPA estimates of typical costs, and reported costs at similar Superfund sites). Did Bardon describe the projected costs in "reasonable detail" and "reasonably identif[y]" and "reasonably quantif[y]" them within the five-year limit? First, the very setting of a time period

for identifying, etc., future costs implies an obligation on Bardon's part (if it meant to obtain contribution from the shareholders) to try to reduce the uncertainty of the costs by acting with reasonable diligence, as circumstances might permit, to run the course of activities toward cleanup. For such implications from contract terms, cf. *Stabile* v. *McCarthy, supra* at 402-403; *Sechrest* v. *Safiol, supra* at 571; *MacGillivary* v. *W. Dana Bartlett Ins. Agency of Lexington, Inc.*, 14 Mass. App. Ct. 52, 57 (1982); 2 Farnsworth, Contracts § 7.17 (2d ed. 1998); Restatement (Second) of Contracts § 205 (1981). Second, the estimates themselves must provide the detail reasonably to be expected on the basis of the efforts just described. On the record we think there are genuine issues of material fact on both matters.

(1) Investigation and other steps toward remediation have proceeded slowly at Haverhill but it is at least unclear that Bardon, as distinct from the EPA and the natural cussedness of any large cleanup process, was responsible for the sluggishness. Bardon was active between 1988 and 1993. Thus the 1990 letter and § 3.19 of the agreement indicate that Bardon's subsidiary along with the city of Haverhill employed a number of engineering firms and contractors who in 1988-1990 worked on site to the extent of over $500,000 in costs; and there are financial statements and invoices from the period 1990-1993 showing payments to similar companies for like work.

Such efforts, as Bardon suggests, are to be seen in the context of CERCLA and its EPA implementing regulations. The cleanup of a Superfund location is not the fleetest of government-orchestrated endeavors. A remediation (or, more formally, a "remedial action," 42 U.S.C. § 9601[24]), is a "long-term, permanent cleanup[]" that "take[s] years or, in some cases, decades to complete."[15] A commentator notes an average of eight years of study on a site before cleanup even begins, and it may take ten to twelve years from initial investigation to final completion of site cleanup.[16] Add to this that EPA's timing of

---

[15]Sullivan, Environmental Law Handbook c. 13, § 3.2.2, at 438 (14th ed. 1997).

[16]See Rodgers, Environmental Law: Hazardous Wastes & Substances § 8.9(B), at 601 (1992). See also Subcomm. on Investigations & Oversight of the House Comm. on Public Works & Transportation, Administration of the Federal Superfund Program, H.R. Rep. No. 35, 103d Cong., 1st Sess. 6 (1993) ("The Congressional Budget Office estimates that 15 years or more is needed

projects can be eccentric, so certain sites may languish for years, then suddenly spurt forward.[17]

The remedial process under CERCLA is described as having six phases:

> "(1) the remedial investigation (RI), . . . 'an assessment of the nature and extent of contamination and the associated health and environmental risks'; (2) the feasibility study (FS), an analysis of 'potentially applicable remedy technologies, usually undertaken concurrently with the Remedial Investigation'; (3) remedy selection, 'usually a combination of treatment, containment and other technologies'; (4) the record of decision (ROD) preparation, which documents site conditions and explains and justifies the choice of remedy; (5) remedial design, which involves preparation of plans and specifications for implementing the chosen remedy; and (6) remedial action, where construction and other work is undertaken to implement the remedy."

Rodgers, Environmental Law: Hazardous Wastes and Substances § 8.9(B), at 600 (1992) (footnotes omitted). The literature and common experience testify to the inveterate intricacy, protraction, and high expense of these routines as superintended by EPA. The Haverhill project seems characteristic. This landfill was placed on CERCLA's national priorities list in 1984, yet, four years later when the agreement here in suit was executed, the EPA, according to schedule 3.19, was still in the process of identifying PRPs and would only thereafter begin negotiations (presumably with those PRPs) for the performance of an RI/FS study (the first two quoted phases).[18] From the fact that Balsam's estimate of future costs included projected figures for the costs of an RI/FS, it can be inferred that the study had not been completed (or, perhaps, even started) by the date of the estimate, April 21, 1993, some two weeks before the five-year notice deadline under the agreement. Indeed, it is quite possible that

---

from discovery to the completion of cleanup construction for the average Superfund site").

[17]See Sullivan, *supra* at c. 13, § 3.3.3.

[18]An RI/FS may be conducted solely by EPA or, upon EPA's approval, with participation of PRPs. See Rodgers, *supra*, § 8.10(A), at 625-626.

even the search to round out the cast of PRPs, a job that often takes substantial time and effort, still lay ahead.[19]

We conclude it could not be held as matter of law on the record thus far developed that Bardon behaved unreasonably in respect to reducing the uncertainties about future costs that confronted the shareholders as well as itself. Bardon's diligence must be assessed by the trier of fact on a fuller exposition of the surrounding circumstances in which Bardon was operating.

(2) As to the 1993 Balsam estimates proper, the judge rejected them because, in his view, they failed to state in reasonable detail the specific remedial work that would have to be done at the site, and because an estimate with a margin of uncertainty of $42 million was in his view not reasonably quantified or identified. Although we agree the Balsam estimates were not richly detailed and the cost range was wide, on this record one cannot be certain that these features were unreasonable. The question was for consideration upon the facts to be laid out at trial, which may ultimately present a much different picture than that suggested on summary judgment.

The $10 to $52 million spread of estimated future costs was not out of line with the remediation costs for Superfund sites as reported consistently in the literature.[20] We read of *average* costs of $25 to $30 million.[21] It must be kept in mind that Balsam's estimates were prepared at a time when, it seems probable, even the nature and scope of site contamination were not fully known.

Concerning the level of detail, the Balsam estimates were categorized: "Remedial Investigation," "Feasibility Study,"

---

[19]"Whenever confronting a situation involving the need to conduct a cleanup, EPA has two basic options under CERCLA. It may conduct the cleanup itself and later seek to recover its costs from . . . (PRPs) in a subsequent cost recovery action, or it can compel the PRPs to perform the cleanup (either voluntarily or involuntarily) through administrative or judicial proceedings." Sullivan, *supra* at c. 13, § 3.0. Evidently EPA chose the latter option.

[20]According to one source, "[c]osts to implement a remedy at a CERCLA site can vary *considerably*. *Seldom will they be less than* $1 *million. Not infrequently they can exceed* $50 *million.*" Sullivan, *supra* at c. 13, § 3.3.8.

[21]See H.R. Rep. No. 35, *supra* at 5. See also Rodgers, *supra*, § 8.9(B), at 601 ("remedies average $25 million, several have exceeded $100 million, and a few are approaching $1 billion"); Reilly, Superfund Reform for the 105th Congress, SC27 ALI-ABA 1, 6 (1997) (Superfund cleanup "costs at least $30 million"); Fairbanks, The Industri-Plex Model: Beneficial Reuse of a Superfund Site, 23 B.C. Envtl. Aff. L. Rev. 851, 858 (1996) (average $30 million).

"RD/RA Negotiations," "Pre-Design Investigations," "Remedial Design," "Remedial Action," and "EPA Oversight and Past Cost." Each category carried its own range of estimated costs, except for "Remedial Action" which was divided into six subcategories, each with its own estimate — "Landfill Cap," "Groundwater Treatment," "Sediment Excavation," "Hotspot Remediation," "Operation & Maintenance," and "Contingency (20%)." In contrast to the unacceptably general categories of *past* costs recited in the 1990 notice, here the categorization of *future* costs is understandable and not fatal to Bardon's ultimate claim. It needs repetition that the estimates were prepared when the RI/FS was not complete, and a remedy to be chosen by EPA still lay in distant prospect, which in turn would need to be developed into a plan that could only then be translated into specific contracted-for actions on the ground by engineers and consultants. So we have a triable issue on the reasonableness of the level of detail provided.

The judge also thought Balsam did not "reasonably identif[y]" or "reasonably quantif[y]" the estimated costs because there was no evidence that the company made an on-site investigation of the Haverhill landfill. However, the record supports an inference that Balsam's estimates were based in part at least on direct familiarity with conditions on the site.[22]

### A Separate Claim

After receiving Bardon's 1990 notice, shareholders Francis R. and Louis E. Guyott, Jr. (the latter purporting to represent also the remaining shareholders), sued Bardon and Guyott Company in the United States District Court for Massachusetts on August 6, 1991, seeking a declaration that the notice concerning the non-Haverhill sites did not satisfy section 5.12 of the shares purchase agreement; the reasons alleged are now familiar. On Bardon's motion, the judge on August 21, 1992, dismissed the action under Fed.R.Civ.P. 19(b), as the remaining shareholders were necessary parties who could not be joined because

---

[22]Balsam indicated its estimates were based in part on "reported costs for performing remedial activities listed in the table at other Superfund sites of *similar type*; and estimated costs for remediation at a *similar municipal landfill* Superfund site in EPA Region 1, the Dover Landfill Superfund site" (emphasis added). The basis of such comparison was familiarity with the Haverhill site, and invoices attached to the 1993 and 1995 notice letters show Balsam's involvement with the site at least as early as September of 1991.

their joinder would destroy diversity of citizenship, 28 U.S.C. § 1332(a), (c) — Bardon was a Massachusetts corporation and some of the shareholders had Massachusetts citizenship. Although the decision in practical effect barred the two Guyotts from all recourse to Federal court, they did not appeal.

Section 5.13 of the agreement (see text in the margin)[23] provides that the "prevailing party" in any action relating to section 5.12 shall be paid by the other party "all of its costs and expenses, including attorney's fees" incurred in the action. Accordingly, Bardon on December 6, 1994, made demand on the two Guyotts for payment of its costs and attorney's fees in the Federal action (totaling an alleged $52,779.86). As payment was not made, Bardon set out its claim against the two Guyotts as a separate count of the present action in Superior Court. The judge denied the claim, and Bardon appeals from the denial.

The judge supported his decision only by citing Fed.R.Civ.P. 41(b), which states that dismissal for nonjoinder of parties is not an adjudication on the merits. Evidently the judge supposed that a defendant securing dismissal of the action is not a "prevailing party" under a contractual fee payment clause unless the dismissal is on the merits. But the clause herein gives no hint of such a limitation; it is plain spoken and "prevailing party" is to be understood in the "ordinary or popular" sense, *Santisas* v. *Goodin*, 17 Cal. 4th 599, 609 (1998), and given "commonsense meaning," *Walji* v. *Candyco, Inc.*, 57 Wash. App. 284, 288 (1990).

Our commonsense reading also accords with case law suggesting that the usage of "prevailing party" in a contractual fees payment clause should be consistent with the usage of the same words governing liability for court costs in ordinary civil actions. In *Hannon* v. *Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 828 (1982), the court, considering a contract provision awarding costs and expenses including attorney's fees to the "prevailing party," indicated this referred to the party in whose favor judgment enters, and cited *Smith* v. *Wenz*, 187 Mass. 421, 425 (1905), which arose under a predecessor to G. L. c. 261, § 1 (prevailing party to recover costs). The sug-

---

[23] "5.13 *Attorney's Fees*. If there is any action to enforce payments by the Shareholders under Section 5.12 of this Agreement or any other action arising under or relating to said Section 5.12, then the prevailing party shall be paid by the other party or parties all of its costs and expenses, including attorney's fees, incurred in any such enforcement action."

gested equation of meaning is interesting for the present case, for it has long been held at common law and general statute that a defendant succeeds as to costs as the prevailing party when the action is dismissed for lack of subject matter jurisdiction, see *Elder* v. *Dwight Mfg. Co.*, 4 Gray 201, 205 (1855); *Pepper* v. *Old Colony Trust Co.*, 268 Mass. 467, 471 (1929); *Donnelly* v. *Montague*, 305 Mass. 14, 20 (1940), in case of nonsuit at law or dismissal of a bill in equity without prejudice, see *Inhabitants of Weston* v. *Board of R.R. Commrs.*, 205 Mass. 94, 97 (1910), or on voluntary discontinuance or dismissal by the plaintiff, see *Stevens* v. *Stevens*, 1 Met. 279, 280 (1840). Similarly, under the Federal rule providing for costs, Fed.R. Civ.P. 54(d), it is said that "a dismissal of the action, whether on the merits or not, generally means that defendant is the prevailing party." 10 Wright, Miller, & Kane, Federal Practice & Procedure § 2667, at 209-210 & n.14 (3d ed. 1998). Our rule 54(d) would likely be interpreted on this point in harmony with its Federal counterpart. See *Waldman* v. *American Honda Motor Co.*, 413 Mass. 320, 325 (1992). That section 5.13 is couched in terms of "costs and expenses, including attorney's fees," points to the relevance of the usage of "prevailing party" in the field of costs.

The Guyotts seek solace in cases involving workers' compensation and civil rights statutes, which entitle a "prevailing party" to recover attorney's fees: there the prevailer is seen as one who succeeds on a "significant" litigation issue, achieving "some of the benefit" sought in the controversy. See *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 821-822 (1985) (Massachusetts civil rights, G. L. c. 12, § 11I); *Fedele* v. *School Comm. of Westwood*, 412 Mass. 110, 117 (1992) (Federal civil rights, 42 U.S.C. § 1988); *Connolly's Case*, 41 Mass. App. Ct. 35, 38 (1996) (workers' compensation, G. L. c. 152, § 13A[5]). There is no basis for relating our section 5.13 to these specialized statutes. See *Santisas* v. *Goodin*, 17 Cal. 4th at 609. Cf. *Walji* v. *Candyco, Inc.*, 57 Wash. App. at 288. At all events, the provisions for attorney's fees in the two cited Massachusetts statutes are confined by their terms to plaintiffs who succeed, so the language of the cases is understandable; a plaintiff does not "prevail" without obtaining relief. The Federal civil rights provision is not confined to plaintiffs, and there is authority indicating that a success on the merits is nonetheless required. See *Szabo Food Serv., Inc.* v. *Canteen Corp.*, 823 F.2d 1073,

1076-1077 (7th Cir. 1987), cert. dismissed, 485 U.S. 901 (1988); *Hughes* v. *Unified Sch. Dist. #330, Wabaunsee County,* 872 F. Supp. 882, 884-888 (D. Kan. 1994). However, the way for recovery of attorney's fees is made hard for defendants as a bow to the important policy of avoiding overdeterrence of plaintiffs from commencing civil rights suits for fear of having to pay defendants' attorney's fees. See 10 Moore's Federal Practice § 54.171[3][d][iii], at 54-295 (3d ed. 1997); Rossi, Attorneys' Fees § 10:21 (2d ed. 1995). Our section 5.13 extends to defendants and no such special policy obtrudes. Cf. *Bird* v. *Bird,* 24 Mass. App. Ct. 362, 365 (1987) (rejecting analogy between "successful party" under contractual attorney's fee clause and "prevailing party" under the Federal civil rights provision).

Our question of defendant's attorney's fees arose on virtually identical facts in *Anderson* v. *Melwani,* 179 F.3d 763, 765-766 (9th Cir. 1999). A diversity action involving an employment agreement was dismissed under Fed.R.Civ.P. 19(b) for failure to join a party whose joinder would destroy diversity. The agreement provided for the recovery by the "prevailing party" of attorney's fees incurred in litigation over the agreement. The Ninth Circuit rejected the plaintiff's argument that the defendant could not recover under this provision where no decision on the merits was reached. Declining to apply the merits-based treatment of prevailing party from the civil rights context, the court was more persuaded by cases interpreting the language in its contract setting. See *id.* at 766, citing *Century Constr. Corp.* v. *Koss,* 559 So. 2d 611 (Fla. Dist. Ct. App. 1990) and *Walji* v. *Candyco, Inc., supra.* See also *Santisas* v. *Goodin, supra.* In a practical view, the court concluded that, even if the dismissal did not implicate the merits of the claim, it did engineer a permanent defeat of the Federal lawsuit, and an award of attorney's fees under the contract reflected appropriately the fact that "the plaintiff has dragged the defendant through a costly and ultimately fruitless exercise." To similar effect, see *Bromley* v. *Mitchell,* 902 P.2d 797, 804-805 (Alaska 1995); *Van De Hey* v. *United States Natl. Bank of Oregon,* 91 Or. App. 547, 550-551 (1988).

## CONCLUSION

*Main case.* The judgment is affirmed insofar as it held the shareholders not liable for any environmental costs associated

with the non-Haverhill sites, and not liable for past environmental costs associated with the Haverhill site. The judgment is reversed insofar as it held the shareholders not liable for estimated future environmental costs associated with the Haverhill site as described in the April 26, 1993, notice, and this matter is remanded for trial in the Superior Court in accordance with this opinion. On remand, the declaration of rights shall be modified to conform to the foregoing dispositions.

The award of attorney's fees in favor of the shareholders is reversed.

*Separate claim.* The dismissal of Bardon's claim for costs and counsel fees in the Federal action is reversed and this matter is remanded to the Superior Court for the entry of judgment in favor of Bardon in reasonable amount as found by the court.

*So ordered.*

APPENDIX.

"5.12 *Post-Closing Covenant.* With respect to the environmental matters disclosed in Schedule 3.19 to this Agreement, the parties acknowledge that costs, expenses, liabilities and obligations will arise in connection with and out of the existing conditions which have given rise to such matters, including without limitation those relating to investigations, corrections and remediation. Such costs, expenses, liabilities and obligations, whether or not reflected in the financial statements, and which may or may not be directly incurred by [Bardon] . . . , to the extent that [Bardon] . . . may be liable therefor, are referred to herein as 'Environmental Costs.' No liabilities or obligations shall be regarded as such for purposes of this Section until they have been reasonably identified and reasonably quantified either by reference to an amount or a range of possible exposures through investigation or negotiation with third parties or the like. The parties agree that such Environmental Costs shall be the sole responsibility of [Bardon] . . . to the extent that such Environmental Costs do not exceed One Million Dollars ($1,000,000). The Shareholders, on the one hand, and [Bardon] . . . , on the other hand, shall each be responsible for one-half of all Environmental Costs in excess of One Million Dollars ($1,000,000), and accordingly the Shareholders, on the one hand, and [Bardon] . . . on the other hand, agree, jointly and severally, subject to the time and notice limitations set forth in this Section, to pay one-half of all such excess Environmental Costs. If and when there have been Environmental Costs in an amount equal to One Million Dollars ($1,000,000), . . . [Bardon] shall deliver to the Shareholders . . . a verification of that fact by a financial officer together with a description of such Environmental Costs in reasonable detail, including the payees or expected payees, and . . . [Bardon] shall thereafter give the Shareholders prompt written notice . . . of any such excess Environmental Costs which have arisen, and a description thereof in reasonable detail, including the payees or expected payees. The Shareholders shall not be liable for payment of one-half of any such excess Environmental Costs as to which such notice has not been given within five (5)

years after the Closing Date with respect to Environmental Costs relating to the property in Haverhill, Massachusetts or within two (2) years after the Closing Date with respect to all other such Environmental Costs. Payments with respect to such excess Environmental Costs required to be made by the Shareholders hereunder shall be made within thirty (30) days after submission by [Bardon] . . . to one of the Representatives [of the shareholders] of evidence that such an excess Environmental Cost, of which notice has been given as aforesaid, has been paid or is due and payable in which event [Bardon] . . . shall make payment of its one-half share not later than the date of payment by the Shareholders of the other one-half share."