Fabricant, J.
INTRODUCTION
Chester Howe brings this action against the estates of his former law partners, Richard Ely and Arthur P. Schmidt, seeking indemnification for his payment in settlement of the judgment that was affirmed by the Supreme Judicial Court in Williams v. Ely, 423 Mass. 467 (1996) (“the underlying action”). The defendants have counterclaimed, seeking indemnification from Howe for their contributions to the same settlement. Presently before the Court are cross-motions for summary judgment. For the reasons that will be explained, the plaintiffs motion will be allowed and the defendants’ cross-motion will be denied.
BACKGROUND
The materials submitted in connection with the present cross-motions establish the following facts as undisputed.[1] Chester Howe, Richard Ely, and Arthur P. Schmidt were among the partners of two law firms that merged in 1974 to form the firm of Gaston Snow & Ely Bartlett, later renamed Gaston & Snow (“Gas-ton”). All three, along with all others who were then partners, signed the firm’s “Articles of Partnership,” dated March 1, 1976 ("the 1976 agreement”).[2] Article 16 of that document provided, in pertinent part, as follows:
In case a Partner shall withdraw from the partnership except upon dissolution thereof by general consent, the remaining Partners continuing the partnership business, jointly and severally, covenant and agree with such Partner, his legal representatives and heirs, that, unless the partnership shall be insolvent on the date of his withdrawal as a Partner, they will indemnify and save him, his legal representatives and heirs, harmless from all liabilities, obligations, claims, and demands of every description against the partnership which exist at the date of his withdrawal or shall thereafter arise, except liabilities incurred by him and not disclosed by him as aforesaid and except liabilities arising out of his professional conduct.
The 1976 agreement contained certain other terms that also bear on the present dispute. Article 11 provided for presumptive continuation of the partnership business “in the event that a Partner withdraws.” Article 17 provided for partnership meetings, specifying certain actions authorized to be taken at such meetings by majority vote, and others by two thirds vote. Among the actions specified in both categories were some, such as changes in the composition of the partnership, change in the firm name, and termination of the partnership, that would by their nature supercede provisions of the partnership agreement.[3]
*126 In 1984, Gaston adopted its “Articles of Partnership, March 1, 1976, as amended through and as of March 1, 1984" (“the 1984 agreement”). Howe, Ely, and Schmidt all signed the 1984 agreement.[4] Article 16 of the 1984 agreement contained an indemnification provision substantively identical to that in the 1976 agreement.[5] The pertinent provisions of Articles 11 and 17 also remained substantively unchanged.
In each of 1985 and 1986, the partners voted to approve proposed amendments to the partnership agreement (“the 1985 agreement” and “the 1986 agreement”).[6] Signature pages were circulated, but the evidence offered includes no copy of either document signed by anyone. Howe has no present memory of whether he signed the 1985 agreement or not, but testified in the underlying action that he did not, and no evidence is offered that he did. Howe declined to sign the 1986 agreement, objecting to the changes made. In his deposition testimony in this case, Howe characterized his refusal as “a protest,” indicating that “I thought the partnership was headed in the wrong direction.” Howe nevertheless remained a partner in the firm; according to his deposition testimony, which is not contested by any contrary evidence, “my position in the firm did not change one iota, whether or not I signed it.” Howe characterizes the 1986 agreement as “the final partnership agreement under which I functioned.” Howe knows of no partner other than himself who did not sign the 1986 agreement. The defendants contend that Ely and Schmidt both signed the 1985 and 1986 agreements, and no evidence is offered to the contrary.
The 1985 agreement contained the indemnification provision of Article 16 in language identical to that in the previous version, and remained unchanged in the pertinent provisions of Articles 11 and 17 as well. The 1986 agreement included a number of significant new provisions, resulting in renumbering of pre-existing provisions, but the portions pertinent here remained without substantive change; the indemnification language previously in Article 16 appeared in Article 18, and the provisions noted supra, previously appearing in Articles 11 and 17, appeared as portions of Articles 13 and 19.[7]
Howe resigned from Gaston effective March 1, 1987, to become general counsel for the A.W. Chesterton Company. Ely resigned in September 1987, to join several other Gaston partners in establishing the Boston office of Dechert, Price & Rhoads. Effective January 1, 1988, the firm again amended its partnership agreement. Schmidt signed this amendment. Schmidt retired from Gaston, and from the practice of law, effective February 29, 1988. The firm’s fortunes declined over the succeeding several years, and in September of 1991 Gaston ceased operations and filed for bankruptcy relief. Ely died in 1990, at age 83, and Schmidt died in 1996, at age 80.[8]
On February 4, 1988, while the firm was still operating, and before Schmidt’s retirement, but after Howe and Ely had left, certain former clients of Gaston brought the underlying action in Norfolk Superior Court, Civil Action No. 88-360, alleging malpractice by certain attorneys of the firm in connection with tax advice given in the mid-1970s. Named as defendants in that action were a long list of individuals, including Howe, Ely, and Schmidt, who had not been involved in the alleged negligence, but who were nevertheless alleged to be liable by virtue of their status as partners in the firm at the time of the alleged malpractice. In August of 1994, the plaintiffs in the underlying action recovered judgment against some of the named defendants, including Howe and the estates, of Ely and Schmidt, and that judgment became final after the defendants’ unsuccessful appeal. See Williams v. Ely, 423 Mass. 467 (1996). Some of the parties to that action, including the three parties here, then entered into a settlement agreement under which these three and certain others each paid $250,000 in return for a general release. Howe now seeks indemnification for his payment pursuant to the indemnification provisions of the various successive partnership agreements; the defendants’ counterclaims seek indemnification from Howe for their corresponding payments.
DISCUSSION
This Court grants summary judgment where no genuine issues of material fact exist and the summary judgment record entitles the moving party to judgment as a matter of law. Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine dispute of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of the claim at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the. absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Pederson, 404 Mass. at 17. “To avoid summary judgment, an opposing party may not rely upon his pleadings or bald conclusions but must set forth specific facts showing that there is a genuine issue for trial." United States Trust Co. of New York v. Herriott, 10 Mass.App.Ct. 313, 318 (1980); see also Trustees of Tufts College v. Parlane Sportswear Co., Inc., 4 Mass.App.Ct. 783, 784 (1976).
*127 To recover on a claim for breach of contract, a plaintiff must show the existence of a contract, his own performance of his material obligations under the contract, the opponent’s breach of a material obligation, and the resulting damages. See Singarella v. City of Boston, 342 Mass. 385, 387 (1961); Loranger Construction Corp. v. E.F. Hauserman Co., 1 Mass.App.Ct. 801 (1973); Gluckenberger v. Boston University, 974 F. Sup. 106, 150 (D.Mass. 1997). A valid contract requires terms identifying all material obligations of the parties. See City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999). “It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement.” Situation Management Systems, Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000).
I. Existence of a Contract.
The parties agree that Howe and the decedents were parties to a series of contracts, up to and including the 1984 partnership agreement, each containing the indemnification provision on which Howe relies. The question, then, is whether something happened after 1984 that eliminated the contract of indemnification among them. The defendants argue that each of the 1985 and 1986 agreements superceded its predecessor upon adoption by the partnership. This maybe so. Although Article 17 of the 1976 through 1984 agreements (Article 19 in the 1986 version) does not by its terms grant authority for the adoption of an entirely new partnership agreement, it does explicitly authorize the partnership as a whole to take actions that would necessarily change the terms of the partnership agreement, even over the dissent of at least a third of the membership. Thus, the agreement in its various versions may fairly be construed as authorizing adoption of a new partnership agreement, superceding its predecessor, by two-thirds vote of the partnership. That the 1985 and 1986 agreements may have super-ceded their predecessors, however, does not undermine Howe’s claim, since both of these agreements contain the same indemnification provisions as the earlier versions.
Defendants’ argument goes on: By his refusal to sign the 1985 and 1986 agreements, they contend, Howe declined to become a party to them. Thus, they argue, the partnership’s adoption of the 1985 and 1986 agreements not only terminated all earlier agreements, but also terminated all contractual rights of any partner who declined to sign the new versions. Howe’s status, they suggest, reverted to that provided by law under the Uniform Partnership Act, G. L.c. 108A, which includes no indemnification right.
This argument finds no support in the terms of any version of the partnership agreements. The agreement in its various versions empowers the partnership to adopt changes over dissent, and to make those changes binding on a dissenter, but nothing in any provision of any version of the agreement purports to empower the partnership to adopt changes applicable to some partners and not others, or to compel a dissenter to sign an amendment on pain of forfeiture of all contractual rights.[9] If the 1985 and 1986 agreements took effect by votes of the partnership pursuant to powers granted in provisions in each previous agreement, and thereby superceded that previous agreement and extinguished all rights under it, then each of them thereafter governed the rights and obligations of all partners, including any who declined to sign, for the period of time it was in effect. Thus, if the 1986 agreement was in effect at the time of Howe’s withdrawal from the partnership on March 1, 1997, then the indemnification provision of that agreement, identical to that in each of the earlier agreements, governs these claims.
II. Application of the Indemnification Provision of the Contract.
The parties disagree on four issues with respect to application of the indemnification provision, quoted supra: (1) whether Ely and Schmidt were “Partners continuing the partnership business” at the time Howe withdrew from the partnership; (2) whether Howe’s withdrawal to practice elsewhere entitles him to indemnification; (3) whether the indemnification provision survives the firm’s bankruptcy; and (4) whether Howe’s liability in the underlying action arose from his professional conduct. The undisputed facts, considered in the light most favorable to the defendants, require resolution of all four issues in Howe’s favor.
It is beyond dispute that Ely and Schmidt were partners engaged in the partnership business at some point.[10] Their contention that they both signed the 1986 agreement establishes that they continued as partners at least through May 21, 1986, when that agreement purported to take effect, and that their status as of that date became that of equity partners pursuant to Article 3 of that agreement.[11] It is also undisputed that both remained physically present in the firm through, and after, the date of Howe’s withdrawal. The question, then, is whether some change in their status occurred between May 21, 1986, and March 1, 1987, so as to remove them from the group of “Partners continuing the partnership business” as that term appears in the indemnification provision.
Howe offers deposition testimony, based on personal observations, that both Ely and Schmidt continued their previous activities at Gaston, as they had before, through the time of Howe’s withdrawal. As to Ely, Howe testified to observing him physically present on a regular basis during regular working hours, interacting with clients, and participating in discussions of billing his clients and in discussions regarding changes in the firm’s management. As to Schmidt, Howe also offers deposition testimony of Schmidt’s widow that he ceased working at Gaston as of Febru *128 ary 29, 1988, that the firm gave a retirement party for him on that date, that until “within six months” of that date “he would go sometimes into the office,” and that on those occasions, according to her understanding from information provided to her by her husband, “he worked.” Howe also offers evidence, through his own deposition testimony and that of other former partners, that no announcement of retirement or withdrawal ever occurred with respect to either Schmidt or Ely prior to his own withdrawal, and that no witness has knowledge of either ever having submitted to the firm’s management committee any notice of retirement or. withdrawal prior to that date. Similarly, no evidence is offered that either ever gave notice of assuming the status of Senior Partner under Article 3 of the 1986 agreement. Howe also provides evidence that in the underlying action each took the position that he was a partner of the firm during the time in issue here.[12] For purposes of summary judgment, this evidence suffices to establish the absence of any factual dispute, so as to shift to the defendants the burden of identifying admissible evidence from which a reasonable factfinder could conclude otherwise.
Defendants’ effort to meet this burden rests primarily on their tax returns.[13] Ely’s 1986 return shows only partnership income from Gaston. His 1987 return shows both partnership income and pension income from Gaston, with the former in a larger amount. On his 1987 schedule E form, regarding partnership income, Ely entered[14] the bulk of his partnership income in a column marked “Passive income from Schedule k-1,” but checked a box marked “no” in response to the question “Not at-risk?” On his “statement 4,” regarding partnership income, he checked “no” boxes in response to “general partner” and “trade or businessmaterial participation.” Ely’s 1988 return again shows both partnership and pension income from Gaston, but this time the pension income is larger. In other pertinent respects, the 1988 return is consistent with the 1987 return.[15] Ely’s 1989 return shows a small amount of partnership income from Gaston, with pension income and other entries similar to 1988. In each of these years, Ely listed his occupation as “attorney.”
Schmidt’s estate offers two tax documents: his 1987 federal tax return, and a New York City form identified as “Schedule K-1 Equivalent” for the fiscal year ending February 28, 1987. Schmidt’s 1987 federal tax return lists his occupation as “lawyer,” shows partnership income from Gaston, and reports no pension income. On Schedule E, Schmidt reported most of his income under “Passive income from schedule k-1,” with small amounts under “Non-passive” income and loss, and answered “no” to “Not at risk?" He answered “no” to both “general partner” and “trade or businessmaterial participation.” He paid self-employment tax based on partnership income. The New York form shows Schmidt as “partner no. 91,” with a “0.391670%” interest in the firm. Under “Percentage of time devoted to business,” the word “part” appears. There follow amounts identified as “Partner’s share of New York City Modifications.” The amounts entered include $2,014 as “pymts to retired ptnr.”[16]
These documents provide little, if any, information relevant to the issues presented here. They show that both received partnership distributions through the time period in issue, although Ely also received payments beginning sometime in 1987[17] that he or the firm identified as pension payments. The documents also show that, for purposes of taxation, both defendants adopted certain characterizations of their partnership income with respect to such categories as “passive” or “active,” “material participation” or not, “general partner” or not, and “at risk”'or not. The meanings of those terms under the tax law, and their consequences for tax liability, do not appear in the record. The question here, however, is one not of taxation, but of contract interpretation. The issue is whether, as of March 1, 1987, Ely and Schmidt were “Partners continuing the partnership business,” within the meaning of the indemnification provision. On this issue, whether they were “general partners” or engaged in “material participation” as those terms may have been used in the tax code sheds no light.
In addition to tax returns, defendants rely on two Gaston documents regarding allocation of partnership distributions. First, they point to a document captioned “Management Committee Vote of 3/22/85,” showing names of par tners, with distribution figures for each name, in two alphabetical lists. Ely and Schmidt appear in the second list, along with six others. Most of the distribution amounts in the second list are smaller than most of those in the first list. The second document of this type on which defendants rely is a memorandum dated March 24, 1988, from the managing partner Roger Feldman, to “All Partners,” announcing compensation amounts for all partners, listed in various categories, for the fiscal year that ended February 28, 1988. Ely and Schmidt appear in the category of “Transition Partners,” while Howe appears in the category of “Departing Partners.” These documents, to extent that they bear at all on the issue of application of the indemnification provision, reveal only that during the firm’s fiscal years ending in early 1985 and 1988, Schmidt and Ely remained partners, albeit compensated at levels reflecting the fact that they had begun making a transition toward retirement.
Interpretation of an unambiguous agreement is an issue of law for the Court, not an issue of fact for trial. See Lubermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 465 (1995); Affiliated FM Ins. Co. v. Constitution Reinsurance Corp., 416 Mass. 839, 842 (1994); Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 146 (1982). Contract language that is clear and unambiguous must be construed in its usual and ordinary sense. See Citation Ins. Co. v. Gomez, 426 *129 Mass. 379, 381 (1998); Bardon Trimount, Inc. v. Guyott, 49 Mass.App.Ct. 764, 771 (2000). A contract term is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation, supra, at 381.
Even in the case of an ambiguous agreement, interpretation is a matter of law except insofar as it may turn on facts in genuine dispute. See Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999); USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). In construing any instrument, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in light of the context of the transaction and the purposes to be accomplished. See Starr v. Fordham, 420 Mass. 178, 190 (1995); Shea v. Bay State Gas Co., 383 Mass. 218, 224-25 (1981). Here, although defendants argue that the meaning of “Partners continuing the partnership business,” is ambiguous, they offer no admissible evidence bearing on its interpretation, beyond the agreements themselves. In the absence of such evidence, the issue of interpretation would necessarily be decided as a matter of law, even if the phrase itself might be considered ambiguous. See US Trust v. Henley & Warren Management, Inc., 40 Mass.App.Ct. 337, 343 (1996). Upon consideration of the phrase in context, its meaning is apparent.
The parties entered into the partnership agreement, as well as each amendment to it, against the backdrop of the common and statutory law of partnerships. A partnership, as a matter of law, is “an association of two or more persons to carry on as co-owners a business for profit." G.L.c. 108A, §6; see Commonwealth v. Campbell, 415 Mass. 697, 699 (1993); Fusco v. Rocky Mountain Investments Limited Partnership, 42 Mass.App.Ct. 441, 447 (1997). Thus, as a matter of law, a partner is a co-owner; one who is part owner of a business that is organized as a partnership is a partner, and one who has no ownership interest is not. Under the Uniform Partnership Act, as under previous common law, partners are subject to joint and several liability for debts of the partnership, including both contractual obligations and damages for any torts that may be committed by individual members in conducting the business. See G.L.c. 108A, §§13, 15; Bachand v. Vidal, 328 Mass. 97, 100 (1951); First Nat’l Bank of New Bedford v. Chartier, 305 Mass. 316, 322 (1940); Fennell v. Peterson, 225 Mass. 598, 599 (1917); Kirkland Construction Co. v. James, 39 Mass.App.Ct. 559, 560 n. 3 (1995).
The Gaston partnership agreement, considered as a whole and in each of its various versions, served to establish the firm as an on-going business entity, with the capacity to continue its operations independent of any individual, as well as to define the partners’ rights and obligations toward each other. In order to operate as an on-going entity, and to ensure each partner’s freedom to make individual career choices, the firm had to provide for allocation of liabilities upon any individual’s withdrawal. The indemnification provision met this need by allocating liabilities, with specified exceptions, upon the withdrawal of any individual, to those who remained as participants in the on-going business. Through this mechanism, the agreement freed any withdrawing partner from continuing entanglement, while leaving responsibility where the law would otherwise place it: on all remaining co-owners of the on-going firm.[18]
The operative phrase, “Partners continuing the partnership business,” appears in the indemnification provision in juxtaposition to the phrase “(i]n case a Partner shall withdraw from the partnership.” In context, and in light of the purpose of the indemnification provision, the meaning is clear: “Partners continuing the partnership business,” are all parties to the agreement who remain co-owners of the firm after the date of the withdrawalthat is, all partners except the one who withdraws. The evidence offered here, with respect to both Ely and Schmidt, establishes beyond any genuine dispute that as of the date Howe withdrew, both remained co-owners of the firm and parties to partnership agreement. It follows that the estates of both are obligated to indemnify Howe as provided in the indemnification provision contained in every version of the partnership agreement.
Defendants next argue that a factual dispute exists as to whether the agreement was intended to cover a partner who withdraws to practice elsewhere, as opposed to one who retires, dies, or becomes disabled. Here again, the plain terms of the agreement provide the answer; Article 16 (Article 18 in the 1986 version) expressly refers to any partner who withdraws, without limitation as to the reasons for withdrawal or the nature of any subsequent occupation. Defendants also suggest that the firm’s 1991 bankruptcy prevents application of the indemnification provision. The language of the provision resolves this issue too; by its plain terms, it applies unless the firm is insolvent at the time of withdrawal.[19] No evidence offered here indicates that it was insolvent as of that time, although it became so a few years later.
Defendants next point to the exception in Article 16 for “liabilities arising out of the professional conduct of such partner.” The obvious purpose of this exception is to avoid allowing a partner to shift liability for his own professional malpractice merely by leaving the firm. Conceding that the liability established in the underlying action arose from legal advice rendered not by Howe, but by others in the firm, defendants nevertheless contend that a triable issue exists concerning application of this exception. The argument misperceives the nature of the summary judgment analysis. In the absence of a factual dispute, established by a proffer of conflicting evidence sufficient to *130 support a finding either way, a dispute about application of a contractual provision presents only an issue of law to be resolved by the Court. Here, the undisputed facts establish that the liability arose from professional conduct, but not from Howe’s professional conduct. The exception therefore does not apply.
III. Equitable Defenses.
Defendants finally suggest that factual disputes regarding their asserted equitable defenses of estoppel, unclean hands, and laches preclude summary judgment.
Although they fail to identify any disputed factual issue bearing on these defenses, their contention must be rejected for a separate reason: these equitable defenses cannot prevail against a claim at law for breach of contract; see Srebnick v. Lo-Law Transit management, Inc., 29 Mass.App.Ct. 45, 49 (1990) (“laches is available ... as a defense to a claim that is equitable in nature ... It is not generally available as a defense to a legal claim”); Bishop, Prima Facie Case: Proof and Defense, 17 Massachusetts Practice §2.97 (1997); Smith & Zobel, Rules Practice, 6 Massachusetts Practice §§2.2, 8.17 (1974). The plaintiff here seeks no equitable relief, but only damages for breach of contract. Having established the elements of his contract claim, he is entitled to the relief sought.
CONCLUSION AND ORDER
For the reasons stated herein, the Plaintiffs Motion for Summary Judgment is ALLOWED, and the Defendants’ Motion for Summary Judgment is DENIED. JUDGMENT shall enter for the plaintiff on his breach of contract claim in the amount of $250,000, plus interest and costs as provided by law.[20] JUDGMENT of dismissal shall enter on the defendants’ counterclaims.

 As to those facts that one side contends are genuinely disputed, the Court has considered the evidence offered in the light most favorable to that side.

 The 1976 agreement listed the parties thereto by name, including these three.

 Article 17, entitled “Meetings and Votes” provided in pertinent part:
The following matters shall be decided by majority vote of the whole number of the Partners at the time of the vote, after consideration of the recommendation of the Management Committee:
(a) the involuntary retirement, or determination of the disability, of a Partner;
(b) a change in the location of the principal office of the partnership;
(c) any material change in, or termination of, the capital account of the partnership;
(d) any material change in, or termination of, the Partnership Retirement Policy or the Keogh Plan of the partnership;
(e) a change of the firm name; and
(f) appointment of auditors.
The following matters shall be decided by two-thirds vote of the whole number of the Partners at the time of the vote, after consideration of the recommendation of the Management Committee:
(a) the admission of additional Partners, and;
(b) the merger of the partnership with another law firm or the dissolution, liquidation, or termination of the partnership.

 Among the materials submitted is a copy of the 1984 agreement with signature lines for each partner, each line bearing a signature. As defendants point out in their response to plaintiffs statement of undisputed facts pursuant to Superior Court Rule 9A(b)(5), the signature above Ely’s name is less than legible, and the evidence offered does not include testimony of any witness identifying the signature as that of Ely, or recounting a memory of Ely signing. Defendants do not, however, identify any evidence that Ely did not sign the 1984 agreement, nor do they contend that he did not. In the absence of any such contention, the Court takes the document itself, with its signature purporting to be that of Ely, as establishing that he did. The 1984 agreement dispensed with the listing of parties by name, referring to them in Article 2 merely as “the partners." Subsequent versions followed this form.

 The only change in the indemnification provision from 1976 to 1984 was the substitution in several places of the phrase “such Partner” or “of such Partner” for “him" or “his.”

 The record does not provide details of these votes, such as when or where they occurred, or how many voted in favor or against. It appears undisputed, however, that such votes occurred, and nothing in the record identifies any dissenter other than Howe.

 Among the most significant changes in the 1986 agreement was the creation of classes of partners, designated as “Partners, Equity Partners and Senior Partners.” Under Article 3 of that agreement, “[a]ll individuals who were Partners on May 20, 1986 are . . . Equity Partners.” The same article provides that “an Equity Partner may elect to become a Senior Partner ... by giving written notice.” Article 3 further provides that “Unless the context otherwise requires, the terms ’’Partner" and “Partners" when used in these Articles shall mean and include any and all Partners, Equity Partners and Senior Partners." Articles 7, 8, and 11 provide for differential treatment of equity partners and senior partners with respect to capital accounts, distribution of profits, and eligibility for membership in a decision-making entity known as the “Council.” Article 12 authorizes “any Partner” to retire voluntarily by giving written notice, and provides that “[a] Partner shall cease to be a member of the partnership and be deemed to have withdrawn upon the effective date of retirement of such Partner ..."

 Gaston had a general policy requiring partners to begin reducing their hours and receiving reduced compensation at age 65, and to retire completely as of age 72, but the firm made exceptions to that policy, especially for some of the older partners, such as Ely, whose partnership predated the 1974 merger.

 Article 17 (Article 19 in the 1986 version) does, by its terms, authorize the “involuntary retirement” of a partner by majority vote of the partnership. Nothing in the record suggests that the firm ever took such action against Howe, nor do the defendants contend that it did.

 Defendants suggest some equivocation on this point with respect to Ely, based on deposition testimony of Alan Lefkowitz that “I don’t think he ever practiced much law," and of Roger Feldman to similar effect. Defendants do not, however, assert any serious argument that Ely was never a partner engaged in the partnership business, nor could they on the record presented. In context, the import of this testimony appears to be that Ely's value to the firm had long rested *131 more on his prominent name and his relationship with certain clients (including a company operated by his son, and another of which he was a trustee) than on his own legal work. This evidence supports, rather than undermines Howe’s position, insofar as it indicates that Ely’s level of activity during the time in issue here was consistent with his long-standing role at the firm, rather than reflecting a change in status.

 Schmidt’s execution of the 1988 partnership agreement would seem in itself sufficient to resolve the issue as to him.

 It appears that among the issues in dispute in the underlying action was whether each defendant was bound by an agreement made by the firm to toll the statute of limitations on the underlying claim. That issue apparently turned on whether each individual was a partner in the firm at the time the tolling agreement was made. For that purpose, among others, each defendant in that case submitted to the Court a form questionnaire indicating “all time periods during which you were a partner of Gaston & Snow and/or its predecessors.” Ely’s estate responded “until September 1997.” Schmidt himself answered “?/?19512/29/88.” Affidavits and trial testimony in the underlying action were consistent with these responses.

 Ely’s estate also offers two affidavits óf Robert Karelitz, a vice president of Fiduciary Trust Company who has been in charge of administering the estate, asserting certain conclusions he has reached based on his review of tax returns and conversations with persons identified only as “two former partners of Gaston Snow.” Mr. Karelitz’s conclusions, based on these sources, are not admissible evidence, and add nothing to the summary judgment analysis. Similarly, conclusions set forth in answers to Howe’s interrogatories by representatives of each defendant’s estate provide no admissible evidence.

 Both Ely’s and Schmidt’s tax returns show Gaston as tax preparer.

 A change in the form between 1987 and 1988 appears to clarify the question of whether the taxpayer’s partnership interest is “at risk.” The 1988 form asks “Investment at Risk?” and offers a choice between “All is at risk” and “Some is not at risk.” Ely checked the former. Instructions on the 1987 form indicate that a “no" answer was to the same effect.

 Defendants rely on this document as indicating that Schmidt received payment from Gaston as a retired partner during the firm’s fiscal year ending February 28, 1997. The document itself, however, does not say that the taxpayer is the recipient of the payments reflected. To the contrary, on the face of the document it appears that the amount reported is the share attributable to the taxpayer, as part owner of the firm, of payments made by the firm to one or more retired partners. The evidence offered provides no information as to any definitions applicable to such reporting, or any tax consequences of such payments under New York law.

 Howe contends that Ely’s pension payments began in November, based on a document identified as Ely’s check register, showing a deposit on November 20, 1987, including an amount noted as “1st payt w/ pension plan.”

 It may be of some relevance here that the on-going firm would be in a better position than the withdrawing partner to ensure the continued maintenance of insurance coverage. Counsel indicated at argument on the present motions that the payments involved here reflect a lapse in insurance coverage for liabilities of the sort asserted in the underlying action. No information has been provided indicating when the lapse occurred, or whether any policies that might have been applicable would have based coverage on the timing of the occurrence or on the timing of the claim.

 Defendants offer, in support of this argument, deposition testimony of Alan Lefkowitz that “it seemed to me an argument could be made that [the indemnification provisions] were not to survive” the firm’s bankruptcy. Asked the basis for that view, Lefkowitz testified that, “I don’t think the parties ever contemplated that there would be a bankruptcy and that in those circumstances the indemnification provisions would be operative . . . That would be the argument that I would have made, if I had been subjected to an indemnification claim against me.” Leikowitz acknowledged that this “argument” was not based on any conversations with anyone prior to the firm’s bankruptcy, or on any drafts of any partnership agreement, or any other documents. Such an “argument” would provide no admissible evidence of the meaning of the agreement, even if it were ambiguous.

 The plaintiff contends that he is also entitled to indemnification for his “legal fees and related expenses” incurred in enforcing his contractual right, but he identifies no contract language, or other authority, for such an award. Defendants’ submissions do not directly address this contention. The Court will award no amount for such expenses at this time, but will consider any supplemental motion the plaintiff might file, in the manner provided by Superior Court Rule 9A, identifying the authority on which he relies, and the amount claimed.