Connolly, Thomas E., J.
Plaintiffs, Elizabeth M. Tamposi (“Elizabeth”) and Julie Shelton (“Shelton”), Trustee of the Elizabeth M. Tamposi GST Trust and the Elizabeth M. Tamposi Trust (collectively “Elizabeth Trusts”), request this court award them attorneys fees and litigation expenses pursuant to G.L.c. 231, §6F and the Tamposi Operating Agreement.[3] Defendants, Tamposi, LLC (‘Tamposi”), Ballinger Properties, LLC (“Ballinger”), Samuel A. Tamposi, Jr. (“Samuel”) and Stephen A. Tamposi (“Stephen”), request this court award them attorneys fees and costs pursuant to the Tamposi Operating Agreement, a 2006 settlement agreement between the parties, and G.L.c. 231, §6F.
FINDINGS OF FACT
In 1992, Samuel A. Tamposi, Sr. created the Samuel A. Tamposi, Sr. 1992 Trust (“Trust”) which is governed by New Hampshire law. The Trust provided that upon Samuel A. Tamposi, Sr.’s death, twelve trusts would be established for the benefit of his six children, Samuel, Jr., Michael, Celina, Stephen, Elizabeth, and Nicholas (“Children’s Trusts”). Each child would have a generation skipping and a non-generation skipping trust. The Trust allowed the trustee of each trust to “pay to or for the benefit of the child and the child’s issue . . . such amounts from the net income and principal of the trust ... as the trustee considers necessary for their education and maintenance in health and reasonable comfort. . .” Samuel A. Tamposi, Sr. provided that Samuel and Stephen *234 would become Investment Directors of the “entire trust property” after his death.[4]
The Investment Directors were (1) entrusted with the “management, control, handling, financing and structuring of any and all real estate interests and other operating entities . . . included in the trust property”;[5] (2) given “full power and authority to direct the retention or sale of all other assets . . . included in the trust property and to direct the purchase of property with any principal cash included in the trust property”; (3) given “full authority to perform any and all other acts which, in the investment directors’judgment, are necessary or appropriate for the proper and advantageous management and investment of the real estate interests, operating entities and other assets . . ., included in the trust property.” The Trust required that the Investment Directors “exercise the powers and discretion herein in a fiduciary capacity for the benefit of the trust held hereunder.”
Ballinger, a New Hampshire company, was created on April 11, 1994 to “acquire, hold for investment, manage and dispose of’ Tamposi family assets. Six Members were named, including Samuel, Stephen, and Elizabeth. Ballinger is managed by Stephen and Samuel.
Tamposi, a Massachusetts company, was created on February 8, 2002 to invest in New England Sports Ventures, LLC (“NESVj which owns the Red Sox.[6] Ballinger is the Manager of Tamposi. Tamposi’s Members are Ballinger and the Trustees of the Children’s Trusts.[7] Article 6.1 of the Tamposi Operating Agreement (‘Tamposi Agreement”) states that the Managers have “the exclusive right to manage the Company’s business. Accordingly, except as otherwise specifically limited under applicable law, the Managers shall; (i) manage the affairs and business of the Company; (ii) exercise the authority and powers granted to the Company; and (iii) otherwise act in all other matters on behalf of the Company... The Managers shall take all actions which shall be necessary or appropriate to accomplish the Company’s purpose.” Further, Article 11.5 of the Tamposi Agreement states, in relevant part: “The prevailing party in any . . . action or proceeding shall be entitled to recover from the other party all costs and expenses, including without limitation the fees and disbursements of counsel, incurred by such party in connection with such action or proceeding.”
On February 27, 2002, Tamposi became the owner of 50 Class B Units of NESV. Tamposi also acquired the right to require NESV to purchase all or some of those 50 Units (“Put Option”) from Tamposi during a “Put Exercise Period.”[8] Although Tamposi could sell its Units to anyone at anytime subject to a right of first refusal by NESV, it could only participate in the Put Option if it gave notice by March 31, 2008. The Put Option could only be exercised once during its lifetime and, once exercised, constituted an irrevocable offer. Exercise of the Put Option triggered a process to value the Units that included appointment of an appraiser by NESV which was “reasonably acceptable” to Tamposi. The final estimate by the appraiser was binding.
In May 2004, in response to an e-mail from the then-trustee of the Elizabeth Trusts, Richard Couser (“Couser”), Tamposi informed Couser that Tamposi planned to wait until 2007 before deciding whether to exercise the Put Option. The letter also stated: “Notwithstanding Sam’s belief that this is a good investment for the family, we can certainly make adjustments given the parameters of the ’’put" option. Although Tamposi, LLC has the “put” option, our settlement agreement could set out that each family member’s trust, with an independent trustee and/or investment director, could make the choice in 2007 as to whether to stay in or get out." On September 1,2006, a “Property Report” for the Trust sent out to “Family Members” indicated that Samuel would meet with John Henry in September to talk about the Put Option “and possibly exercising fewer than the 50 Class B units.”
In September 2006, the Tamposi siblings entered into a Settlement Agreement which is to be interpreted under New Hampshire law and was “intended to buy peace and to cease all controversies, claims, litigation, threats of litigation, by and between the signatories to this Agreement, from the beginning of the world to the effective date.’’[9] Specifically, the Settlement Agreement provided that all Tamposi siblings would release and waive all claims up to the effective date involving Tamposi Family Assets, which included the investment in NESV.[10]
Number 3, Part V(l)(iii) of the Settlement Agreement stated that Samuel and Stephen would resign as Investment Directors of the Elizabeth Trusts with respect to all of those assets owned by those Trusts, except “Tamposi LLC (interest in Boston Red Sox).”[11] The Settlement Agreement also provided, however, that Samuel and Stephen would resign as Investment Directors of the Elizabeth Trusts with respect to Tamposi “upon and to the extent of the sale, liquidation, or conversion of. . . [that] trust asset to cash.” Number 6 of the Settlement Agreement stated that “[e]ach Tamposi Sibling and his/her estate and his/her issue shall indemnify and hold harmless any other signatory to this Settlement Agreement on account of any claims made by that sibling ... on account of the execution or implementation of this Agreement.” (Emphasis in original.)
On November 9, 2006, Couser informed Samuel that Elizabeth wanted the Put Option exercised in 2007 as to her interest in the Red Sox.[12] On November 27, 2006, counsel for Tamposi responded that there was a disagreement as to whether the final “Put Exercise Period” expired on March 31, 2007 or March 31, 2008. Counsel stated that the Put Option would be exercised either in 2007 or 2008 and that Samuel and Stephen thought it wise to exercise it for 75 to 80% of the Units. Counsel acknowledged Elizabeth’s request, but stated that they wanted to make sure to “maximize everyone’s economic gain and minimize any negative tax consequences to the *235 LLC and its members and family individuals.” Tamposi was waiting for confirmation of when the final “Put Exercise Period” expired, exploration of tax implications, and an independent opinion of fair market value.
On November 22, 2006, it was confirmed that the final “Put Exercise Period” expired on March 31, 2008. On December 5, 2006, Samuel wrote to the other Tamposi children stating that Tamposi had hired a company, Management Planning, Inc. (“MPI”), to perform an independent valuation of NESV. Samuel and Stephen thought it prudent to exercise the Put Option in 2007. Samuel reiterated Elizabeth’s desire to sell all of her interest in the Red Sox and their intention to sell 75 to 80% of the Units. On Januaiy 22, 2007, Samuel sent a memorandum indicating that Tamposi had made little progress on the valuation report for reasons such as the Red Sox requested confidentiality agreement. Further, a member of NESV had sold their Units back to NESV and another member was contemplating selling their Units.[13] Samuel thought that Tamposi’s financial interests “may be better served by allowing all of the dust to settle in 2007 regarding buy-outs and possible court action on valuation matters and exercise its put option in 2008,” but was requesting a valuation estimate for both 2007 and 2008. Specifically, “It behooves us to explore all options and maintain flexibility in order to receive the maximum value for our Class B units. Time is on our side as ... we will likely become better informed of the enterprise value as other partners get cashed out. ..”
On February 2, 2007, Samuel wrote to the Tamposi children stating that the effort to get NESV financials had been slow because the Red Sox wanted total control so it could negotiate settlements on buy-outs and avoid any formal valuation process. Samuel thought it was unwise for Tamposi to prematurely exercise its Put Option “until the dust clears.” Additionally, on February 2, 2007, another NESV member sold his Units back to NESV. On February 2, 2007, NESV sent an e-mail to all its members stating its reason for the price it offered in the last two transactions and indicating that it would probably not be able to offer the same in the future.
On February 12,2007, Elizabeth again expressed her desire that Tamposi exercise the Put Option in 2007 as to her interest in NESV. Samuel responded that the Put Option could only be exercised one time and that it was highly unlikely it would be exercised in 2007. On March 27, 2007, Couser requested that Tamposi exercise the Put Option as to Elizabeth’s interest in NESV prior to the March 31, 2007 deadline. On March 29, 2007, Samuel replied that he and Stephen would wait until 2008 to decide whether to exercise the . Put Option. A July 30, 2007 “Property Report” for the Trust laid out the results of the MPI appraisal.
On September 7, 2007, Shelton, who had determined that the beneficiaries of the Elizabeth Trusts had pressing financial needs, requested Samuel and Stephen distribute $2 million to Elizabeth to pay off accumulated debts due to “insufficient cash flow over the past few years as well as some extraordinary expenses.”[14] On September 13, 2007, counsel for Tamposi responded and stated that until Elizabeth signed settlement and release documents, the proposed distribution was premature. On September 14, 2007, Shelton again requested a $2 million distribution and suggested that the “most appropriate asset to sell” was Elizabeth’s interest in the Red Sox. Shelton “formally demanded” that Tamposi begin efforts to sell Elizabeth’s share and agree to distribute the proceeds upon receipt. On September 20, 2007, Tamposi’s counsel refused to sell Elizabeth’s shares; specifically, “Tamposi LLC is doing nothing at this time relative to the Red Sox. Next year would be an appropriate time for another discussion as the put becomes available.”
On September 28,2007, Plaintiffs brought this action for breach of fiduciary duly. Plaintiffs sought preliminary and permanent injunctions (1) directing Ballinger, Samuel, and Stephen to take all steps reasonably necessary to sell one-sixth of the Units in NESV pursuant to the Put Option; (2) enjoining Ballinger, Samuel, and Stephen from receiving compensation, fees, or salary for their service as Managers of Tamposi; (3) enjoining Ballinger, Samuel, and Stephen from charging all or any part of their legal fees or expenses to the Elizabeth Trusts or Elizabeth; and (4) directing Ballinger, Samuel, and Stephen to offer Elizabeth her pro rata share of the Red Sox ownership benefits. In the alternative, Plaintiffs sought preliminary and permanent injunctions directing Ballin-ger, Samuel, and Stephen to rescind Tamposi, LLC and distribute the appropriate membership interests in NESV to Shelton and Elizabeth based upon their respective ownership interests.
On October 12, 2007, Plaintiffs filed an action in New Hampshire Probate Court against Samuel and Stephen, individually and as Investment Directors of the Elizabeth Trusts, alleging breach of fiduciary duly and requesting, among other relief, liquidation of all “Tamposi Companies.”
On December 19, 2007, Tamposi, Ballinger, and Samuel filed four motions: (1) a motion to compel arbitration and stay the proceedings; (2) a motion to dismiss based on the settlement agreement and forum non conveniens; (3) a motion to dismiss for failure to state a claim; and (4) a motion to dismiss Stephen for lack of personal jurisdiction. In the motion to compel arbitration, Defendants argued that Ballinger’s Limited Liability Company Agreement (“Ballinger Agreement”) required arbitration of the dispute. On Januaiy 7, 2008, this court denied the motion finding that Ballinger’s arbitration provision did not apply to disputes concerning the Red Sox shares [23 Mass. L. Rptr. 615].[15] The court denied the last three motions in a footnote of that decision.[16]
On Januaiy 16, 2008, Samuel sent a memorandum to the other Tamposi children indicating that Samuel *236 and Stephen had decided to exercise the Put Option as to 40 of the 50 Units of NESV.[17] On January 17, 2008, Tamposi’s counsel told Elizabeth’s counsel that once MPI’s valuation was complete, Samuel was going to try to privately negotiate the sale because there was concern thatTamposi would be “short-changed” in a sale pursuant to the Put Option. On January 17, 2008, Elizabeth, through her attorney, asked if Samuel and Stephen would enter into a confidential agreement requiring them to exercise the Put Option.[18] The response was no. At his deposition, Stephen testified that he did not believe it would be in Tamposi’s best interest to bind themselves to “such a rigid process when there is other alternatives [sic] that may be more advantageous to the company ... It would not be good business judgment and it would not be a good business decision today to make that commitment without knowing what the circumstances would be at the date that we have to make that decision. We don’t want to do it premature because, quite frankly, we don’t know what may happen over the next two months . . . We have a fiduciary responsibility to handle [Elizabeth’s] investment in Tamposi, LLC, as we would handle our own. We do not want to bind ourselves to something that would be detrimental to [Elizabeth’s] interests and the economic value of her interest in Tamposi, LLC, as well as the remaining members of Tamposi, LLC.”
On January 22, 2008, Judge Troy denied Plaintiffs’ request for an expedited trial date, finding that the time line proposed by Plaintiffs is “neither feasible nor warranted in these circumstances.”
On February 22, 2008, NESV informed its members that formerly unrestricted benefits would henceforth only be provided to members that held at least 50 Units.[19] On March 26, 2008, Tamposi provided notice to NESV that they wanted to exercise the Put Option as to all 50 Units of NESV. Tamposi and the Red Sox later agreed to negotiate the price outside of the Put Option. On March 31, 2008, Samuel informed Julie Shelton that Tamposi had provided notice to NESV to exercise the Put Option. On May 12, 2008, Tamposi sold its shares of NESV. On May 14, 2008, Tamposi received the proceeds from the sale.
On July 24, 2008, Plaintiffs filed a motion to compel the defendants to distribute to Elizabeth and Shelton their portion of the proceeds from the sale of Tamposi’s NESV Units. On October 9, 2008, this court allowed the motion and ordered Ballinger to distribute certain proceeds from the sale to the Elizabeth Trusts. On October 28, 2008, Plaintiffs filed a motion to compel compliance with the order requiring distribution. On October 29, 2008, the New Hampshire Superior Court, in Elizabeth’s divorce case,[20] issued a Temporary Restraining Order prohibiting Shelton from distributing funds from the sale of the Red Sox, to the extent that those funds were disbursed to the Elizabeth’s Trusts, for any purpose. The intent of the order was to freeze the proceeds to which Elizabeth would be entitled as beneficiary of the trusts. On November 26, 2008, this court allowed Plaintiffs’ motion to compel compliance and ordered the Defendants to distribute the proceeds. The New Hampshire Probate Court ordered the same on December 3, 2008.[21]
Both parties now seek attorneys fees and costs.
RULINGS OF LAW
A. Settlement Agreement
The Settlement Agreement requires each Tamposi sibling indemnify and hold harmless any other signatory to the Settlement Agreement “on account of any claims made by that sibling ... on account of the execution or implementation of this Agreement.” The Settlement Agreement also provided that all Tamposi siblings would release and waive all claims up to the effective date involving Tamposi Family Assets, which included the investment in NESV. Defendants argue that Plaintiffs “challenged the implementation of’ the Settlement Agreement by filing this lawsuit because the Settlement Agreement contained a waiver of all claims regarding the sale of the Red Sox.
This court finds that the claims filed by Plaintiffs were not “on account of the execution or implementation of’ the Settlement Agreement. The Settlement Agreement applied to any claim “which could arise from any action or inaction taken to the Effective Date by Releasees.” (Emphasis in original.) There was no “action or inaction” with regard to the Red Sox shares before the effective date of November 13, 2006. Defendants did not refuse to sell Elizabeth’s shares until after the Settlement Agreement became effective. The Settlement Agreement was “intended to buy peace and to cease all controversies, claims, litigation, threats of litigation, by and between the signatories to this Agreement, from the beginning of the world to the effective date.” Although there was discussion of the sale of the Red Sox shares prior to the Settlement Agreement, this court finds that the actual dispute arose after the effective date. Thus, Defendants are not entitled to be indemnified under the Settlement Agreement.
B. General Laws c. 231, §6F
General Laws c. 231, §6F permits a court to assess reasonable legal costs and fees against a party when all or substantially all of its claims or defenses are wholly insubstantial, frivolous, and not advanced in good faith.[22] See Lewis v. Emerson, 391 Mass. 517, 525-26 (1984) (section 6F focuses on the conduct of the litigation, not on conduct prior thereto). Any such decision must describe the specific facts and reasons upon which the finding is based. G.L.c. 231, §6F. Awards of legal fees pursuant to §6F “should be reserved for rare and egregious cases.” Police Commissioner of Boston v. Gows, 429 Mass. 14, 18 (1999); see Masterpiece Kitchen & Bath, Inc. v. Gordon, 425 Mass. 325, 328-29 (1997) (section 6F is a punitive measure that is meant to discourage insubstantial and frivolous actions and defenses). Granting awards only in rare cases prevents §6F from becoming “an indirect method of supplanting the usual rule that *237 taxable costs are deemed full compensation for the expenses of litigation.” Massachusetts Adventura Travel Inc. v. Mason, 27 Mass.App.Ct. 293, 299 n.8 (1989).
A claim is frivolous if there is an “absence of legal or factual basis for the claim” Demoulas Super Mkts., Inc. v. Ryan, 70 Mass.App.Ct. 259, 267 (2007); see Lewis, 391 Mass. at 526 (claim is frivolous if it is “without even a colorable basis in law”). An award of attorneys fees pursuant to §6F also requires a showing that the claims were not advanced in good faith. Hahn v. Planning Bd. of Stoughton, 403 Mass. 332, 337 (1988). Good faith implies “an absence of malice, an absence of design to defraud or to seek an unconscionable advantage.” Id. Massachusetts courts consider the claimant’s subjective belief in the validity of his claim, and whether that belief is reasonable, when evaluating if a claim was made in good faith. See Massachusetts Adventura Travel, Inc., 27 Mass.App.Ct. at 297, 299 (inquiry is neither wholly subjective nor wholly objective).
This court finds none of the parties’ arguments regarding why costs should be assessed pursuant to G.L.c. 231, §6F persuasive. While the court acknowledges that certain actions on both sides could be considered frivolous or not advanced in good faith, none of these actions rises to a level warranting an award of attorneys fees and cost, particularly considering the complex and confusing nature of this entire dispute; specifically, the numerous entities and individuals involved in or potentially affected by this case, the number of interrelated agreements, including the Trust, the Ballinger Agreement, the Tamposi Agreement, the Put Option Agreement, and the Settlement Agreement, and the involvement of the New Hampshire courts, which have been issuing orders and decisions in its respective cases involving the Tamposi family.
In light of the complexity of this case, this court finds that both parties have provided reasonable explanations for their respective actions. For example, Plaintiffs argued that costs should be assessed against Defendants because they offered to dismiss the case if Defendants would enter into a confidential commitment to exercise the Put Option prior to March 31, 2008, at least with respect to Elizabeth’s shares, and Defendants refused. The Put Option, however, could only be exercised once during its lifetime and, once exercised, constituted an irrevocable offer. At his deposition, Stephen testified that he did not believe it would be in Tamposi’s best interest to bind themselves to exercising the Put Option when there were other alternatives available, such as privately negotiating a sale with the Red Sox. As Stephen and Samuel had a fiduciary duly not only to Elizabeth, but all the beneficiaries of the Trust, Defendants’ actions were reasonable.
Elizabeth’s claim, however, for breach of fiduciary duty was not wholly insubstantial or frivolous even if Stephen and Samuel had a legitimate reason for not committing themselves to selling Elizabeth’s interest in the Red Sox and even though Stephen and Samuel “consistently] and repeated [ly] state[d] that they would try and sell most or all of the units in 2008" and indeed exercised the Put Option. The Trust specifically provided that the Investment Directors ’’shall exercise the powers and discretion herein in a fiduciary capacity for the benefit of the trust held hereunder." Plaintiffs filed this action to generate funds necessary to meet what Shelton believed were the needs of the beneficiaries of the Elizabeth Trusts. Defendants’ refusal to provide funds, whether legitimate or not, compelled Plaintiffs to bring this action.
There is just too much involved in this case for this court to find that either party violated G.L.c. 231, §6F. This court will not award attorneys fees when both parties had legitimate goals in initiating and defending this action. Plaintiffs wanted their share of the 50 Units sold before the Put Option expired to get what they believed were necessary funds. Defendants had a fiduciary duty to figure out what was in the best interest of all beneficiaries when determining whether to exercise the Put Option.
C. Tamposi Agreement
The Tamposi Agreement states, in relevant part: “The prevailing party in any . . ., action or proceeding shall be entitled to recover from the other party all costs and expenses, including without limitation the fees and disbursements of counsel, incurred by such party in connection with such action or proceeding.”
Courts interpret the use of “prevailing party” in a contractual fees payment clause the way the words are used to govern liability for court costs in ordinary civil actions. Bardon Trimount, Inc. v. Guyott, 49 Mass.App.Ct. 764, 778 (2000); see also Northern Assocs., Inc. v. Kiley, 57 Mass.App.Ct. 874, 879 (2004) (“Where the language of a contract is unambiguous, the words will be given their plain or well-established meaning”). The party in whose favor judgment enters is a “prevailing party.” Id. A defendant can succeed as to costs as the prevailing party when the action is dismissed, whether on the merits or not, or when a plaintiff voluntarily dismisses or discontinues the action. See id. at 779; see Bardon Trimount, Inc., 49 Mass.App.Ct. at 780 (court can award attorneys fees to a defendant to appropriately reflect that “the plaintiff has dragged the defendant through a costly and ultimately fruitless exercise”). In determining the amount of attorneys fees that are reasonable, the court can consider a parly’s conduct in contributing to the necessity and expense of litigation. Herlihy v. Cushman & Wakefield, 09-P-441 (Mass.App.Ct. 4-30-2010) (unpublished), citing Lattuca v. Robsham, 442 Mass. 205, 211 (2004). An award of attorneys fees is a “highly discretionary matter usually left to the judge.” Herlihy, 09-P-441 (Mass.App.Ct. 4-30-2010) (citation omitted).
This court finds that neither party was a “prevailing party” in this action. The action never went to trial because the Put Option was exercised before the case *238 could be tried. This court finds that it would be impossible to determine whether the Defendants exercised the Put Option because of the lawsuit or because the Put Option was about to expire. There is simply no way to connect Plaintiffs’ lawsuit with Defendants’ decision to exercise the Put Option. While Plaintiffs ultimately obtained the money sought, there was evidence that Tamposi was contemplating a sale of the Red Sox shares before Plaintiffs filed suit.
In addition, this court finds that not awarding attorneys fees to either party reflects that both parties’ conduct contributed to the necessity and expense of litigation. See Herlihy, 09-P-441 (Mass.App.Ct. 4-30-2010). The history of this entire dispute paints a clear picture of the animosity between the parties and that animosity was reflected in the conduct of the parties during the course of this action. The parties’ refusal to cooperate at even the most basic level during the litigation process resulted in numerous motions and hearings, including seven days of hearings on the motions for attorneys fees. This court finds that much of the expense in this case could have been avoided and thus, each party should bear its own attorneys fees.
ORDER
For the reasons discussed above, it is hereby ORDERED that Plaintiffs’ Amended Motion for Orders Regarding Attorneys Fees and Litigation Expenses and Defendants’ Motion for Award of Attorneys Fees and Costs are DENIED.

 Plaintiffs initial request for attorneys fees and costs was pursuant to G.L.c. 231, §6F. On January 12, 2009, Plaintiffs filed an amended motion requesting attorneys fees and costs pursuant to the Tamposi Operating Agreement.

 Samuel A. Tamposi, Sr. died on May 25, 1995.

 The Tmst specifically prevented a tmstee from assuming “any responsibility in connection with the management, control and handling of such real estate interests or other operating entities.”

 At the time of purchase, NESV was called FMBC, LLC. This court will use NESV to avoid confusion.

 The Elizabeth M. Tamposi Tmst has a 11.59% interest in Tamposi and the Elizabeth M. Tamposi GST Tmst has a 3.4% interest in Tamposi. In addition, Elizabeth indirectly has a 1.67% interest in Tamposi because of her 1/6 ownership interest in Ballinger.

 The first ninety days of a calendar year beginning in 2004 and expiring in 2008.

 The Settlement Agreement became effective on November 13, 2006.

 The parties agreed to “expressly waive, remise, release and forever discharge each other signatory to this Settlement Agreement, as Releasees . . . and any other capacities involving assets or businesses of the Tamposi Family Assets and the Trusts . . . from any and all manner of action, cause of action, suit, demand, obligation, judgment, claim .. . and/or defense of any and all types whatsoever, whether at law or in equity, whether known or unknown, contingent or otherwise, which Releasors may have ever had, now have, or hereafter can, shall, or may have against Releasees, upon or by reason of, any manner, cause or thing whatsoever, which could arise from any action or inaction taken to the Effective Date by Releasees, all from the beginning of time . . .” (Emphasis in original.)

 Gerald R. Prunier also resigned as Tmstee of the Elizabeth Tmsts and Elizabeth eventually appointed Shelton as Tmstee.

 The letter also stated that the suggestion in the May 20th letter that each independent tmstee would make a choice whether to stay in or get out of the Red Sox investment, although not included in the Settlement Agreement, was “viable.”

 See Boston Globe article on January 19, 2007.

 Shelton became tmstee in August of 2007.

 The Appeals Court upheld the denial on January 15, 2008..

 The motion to dismiss for lack of personal jurisdiction was dismissed without prejudice.

 Stephen confirmed this in a deposition on January 21, 2008 and admitted that the memorandum was non-binding. He and Samuel could have changed their minds about exercising the Put Option or selling the Red Sox shares.

 On January 2, 2008, in open court, counsel for Plaintiffs offered to dismiss the case if Defendants would enter into a confidential commitment to sell Elizabeth’s interest.

 On February 26, 2008, Judge Troy denied Plaintiffs’ Motion for a Temporary Restraining Order directing Defendants to oppose any amendment to the Operating Agreement of NESV that would limit the right of Tamposi to sell a portion of its ownership units in the Red Sox.

 In May of 2007, Elizabeth’s then-husband, Theodore Goodlander, had filed for divorce from Elizabeth in New Hampshire Superior Court.

 In an order issued on January 21, 2009, the New Hampshire Superior Court explained the happenings in this court and the New Hampshire Probate Court: “Ultimately both courts in Massachusetts and New Hampshire ordered the distribution by the investment directors of the EMIT Trustees’ share of the Red Sox sales proceeds of approximately 1.6 million. This Court, however, restrained any distribution from the EMIT Trusts . . . That restraining order is now vacated

 General Laws c. 231, §6F states:
Upon motion of any party in any civil action in which a finding, verdict, decision, award, order or judgment has been made by a judge ..., the court may determine, after a hearing, as a separate and distinct finding, that all or substantially all of the claims, defenses, setoffs or counterclaims, whether of a factual, legal or mixed nature, made by any party who was represented by counsel during most or all of the proceeding, were wholly insubstantial, frivolous and not advanced in good faith. The court shall include in such finding the specific facts and reasons on which the finding is based.
If such a finding is made with respect to a parly’s claims, the court shall award to each party against whom such claims were asserted an amount representing the reasonable costs and expenses incurred in defending against such claims.